**In re Brent T. JENKINS, Debtor.**

**RAY E. FRIEDMAN AND COMPANY, a corporation, Plaintiff,**

v.

**Brent T. JENKINS and Michael Farrell, Trustee, Defendants.**

**Bankruptcy No. 85–05286. Adv. No. 85–7076.**

United States Bankruptcy Court, D. North Dakota.

Feb. 14, 1986.

Ronald McLean, Fargo, N.D., for plaintiff.

Terry L. Wiles, Fargo, N.D., for defendant, Jenkins.

Michael Farrell, Barnesville, Minn., for trustee.

William Westphal, Minneapolis, Minn., U.S. Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

This matter is before the Court to determine whether the outstanding commodity trading account balance of the Debtor/Defendant, Brent T. Jenkins (JENKINS), with Plaintiff, Ray E. Friedman and Company (REFCO), is a non-dischargeable debt pursuant to section 523(c), and more specifically section 523(a)(2)(A), of the Bankruptcy Code. By Complaint filed August 1, 1985,

the Plaintiff alleges that Jenkins obtained money, services or an extension, renewal or refinancing of credit by false pretenses, false representations, or actual fraud and seeks to have $328,782.60, plus daily interest at the rate of $65.79 per diem from August 1, 1985, declared non-dischargeable. The basis for REFCO's action is that Jenkins issued two checks to it in the amount of $50,000.00 each, to cover losses and partial margin requirements in Jenkins' trading account. The checks were later dishonored because Jenkins, unable to obtain a loan to cover the checks, had stopped payment on them. Jenkins denies that any part of the obligation owing to REFCO was obtained by false pretenses, false representations, or actual fraud. A trial to determine the amount of outstanding debt was held before The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota. The Court entered its Judgment on December 1, 1982, against Jenkins in the sum of $224,280.00, plus pre-judgment interest at the rate of 6% from March 31, 1978, to December 1, 1982, for a total Judgment in the amount of $287,176.71, less the sum of $22,428.00, said sum being the jury award on Defendant's Counterclaim, with post-judgment interest on the net judgment to be at the rate of 9.07%. A trial on the non-dischargeability action was held before the undersigned on January 7, 1986. The Court reserved ruling on the Debtor's motion for directed verdict (summary judgment) made at the close of REFCO's case.

Jenkins filed his Voluntary Chapter 7 Petition on May 14, 1985. An Involuntary Petition had earlier been filed against him by REFCO on June 28, 1978. Jenkins moved to dismiss the Involuntary Petition. The Bankruptcy Court held that the farmer exemption from being involuntarily adjudicated a bankrupt did not apply to Jenkins, and his motion to dismiss was denied. On appeal, the Involuntary Petition was dismissed by the District Court. The Eighth Circuit affirmed the District Court's Order in *Jenkins v. Petitioning Creditor-Ray E. Friedman,* 664 F.2d 184 (8th Cir.1981).

### FINDINGS OF FACT

### 1. JENKINS' BACKGROUND

Jenkins graduated from North Dakota State University in 1968 with a degree in Agricultural Economics. He became involved in farming on a full time basis at that time and was actively involved in farming at least through March of 1978. During his farming tenure, Jenkins farmed up to 2,600 acres. The record is unclear as to whether the 2,600 acres also includes Jenkins' interest in J & M Farms, a Minnesota farming corporation in which Jenkins owned an interest.

Jenkins began trading in the commodity futures market[1] in 1972 or 1973. Prior to November 14, 1977, he traded primarily, if not exclusively, with Bruce Pearson, a broker or account representative with G.H. Miller & Co. Pearson maintained a trading office in Hunter, North Dakota, which is in the vicinity of Jenkins' farm.

---

**1.** The commodity futures market provides traders of commodities such as soybeans, soybean oil, pork bellies, live hog contracts, and other commodities, the opportunity to agree to buy or sell a specific commodity, for a specific price, at some future time. For example, if a trader buys a March soybean contract in January, the trader anticipates that the price of March soybeans will go up and is said to have a "long" position. If the market price for March soybeans goes up, the trader can either sell his March futures contract for a profit or when the contract expires in March, he can take actual delivery of the number of bushels which make up a soybean contract. If the price of the March futures contract goes down, the buyer must either sell its contract at a loss or take delivery of the

actual contract bushels which would probably also cause the trader to incur a loss.

If in January a trader sells a March soybean contract, he is hoping that the market price will decline and he is said to have a "short" position. The trader promises to either buy a March soybean futures contract sometime before the March contract expires to offset his promise to sell, or the trader must make actual delivery of the amount of bushels which make up the contract. If the market price drops, the trader can buy back a futures contract at a cheaper price than he sold it for, thus making a profit. If the market goes up, the trader will lose money because a March contract must be purchased for a price higher than he agreed to sell the March contract for.

Jenkins was heavily involved in commodity trading as early as 1973. The fact that Jenkins' G.H. Miller account varied from a net profit in July of 1973 of $11,160.50 to a net loss for the month of September of 1973 in the amount of $52,092.00 is illustrative of Jenkins' extensive positions. In 1974, Jenkins' G.H. Miller account varied from a $11,492.50 loss in March to a $15,-219.00 profit for September. In 1975, Jenkins experienced a net trading loss in his G.H. Miller account well in excess of $50,-000.00. Historic trading of this magnitude clearly leads the Court to conclude that Jenkins, while perhaps an unwise trader, nevertheless was experienced in trading commodity futures. Jenkins knew he had to meet margin calls and make margin payments [2] and also "knew alot of money could be lost in commodity trading."

## 2. REFCO RELATIONSHIP

Jenkins began his association with REFCO on November 14, 1977. REFCO was a clearing house member of the Chicago Mercantile Exchange, had a seat on the Exchange, and was authorized to engage in commodity trading for its customers. REFCO had its main office in Chicago and provided essentially the same services to Jenkins as had G.H. Miller. Galen Nettum (NETTUM) was the REFCO account executive in the Fargo office with whom Jenkins conducted his trading. Nettum, like Jenkins, had an agricultural economics degree. In addition, Nettum completed course work necessary to obtain a masters degree but did not earn a masters degree. During 1973 and 1974, Nettum raised hogs and traded with G.H. Miller through its Hunter office. Jenkins and Nettum became associated with each other in 1973 when Nettum visited the Jenkins farm to purchase some hog feeders. Nettum testified that he and Jenkins were friends, that they socialized together at the Elks Club, ate out together, had common friends, and that he even assisted Jenkins with some home repairs on one occasion. Jenkins, however, did not view his relationship with Nettum as such a cordial affair and preferred to instead consider his past relationship with Nettum as a friendly acquaintance.

Jenkins opened his trading account with REFCO on November 10, 1977, and made an initial deposit of $700.00 on November 14. Nettum signed a new account information sheet, dated November 10, which listed Jenkins' estimated net worth at $75,000.00, with estimated risk capital of $3,000.00. The parties disagree as to who filled in the figures and from where they were derived. Neither Nettum nor anyone from REFCO's Chicago office ever conducted a credit check on Jenkins, required a financial statement, nor inquired of his assets or liabilities. Although he was unaware of the specific assets and the liabilities held by Jenkins, Nettum testified that irregardless of the figures on the new account information sheet, he knew Jenkins was a "large farmer", that he had "quite a bit of money", and that he was "worth probably a half million".

Jenkins' November trading was on a relatively small scale with four contracts being the largest open positions [3] which he held at the close of any trading day prior to November 30. Prior to November 30, Jen-

---

**2.** A margin payment is a good faith deposit put down by a trader which provides a cushion to protect a trader's broker when the price of a commodity starts working against a trader's position. A margin is a reserve from which a broker can draw to cover any losses if a trader can not come up with more money. A margin call is a message from a brokerage firm that more deposits are needed to protect the firm from any losses in the trader's account. Margin calls are usually mailed from a broker's head office directly to the trader. However, prior to the time a trader will receive written documentation of a margin call, the local broker will probably call his trader and inform the trader that a margin payment is due. Agreements between customers and brokers often, if not always, allow brokers to involuntarily liquidate a customer's account if margin calls are not met within a specified and/or reasonable time period.

**3.** An open position means one has wither bought *or* sold a contract (is long or short) but has not bought *and* sold a particular contract. Thus, a trader with open positions is at risk because the market could go against the trader's position.

kins traded in live hog contracts and in the pork belly market.[4] Jenkins' net cash deposits with REFCO for November were $2,400.00, with a net loss for the month of $1,943.00.

Jenkins' December account had a carryover from November of ten long soybean contracts purchased on November 30. The activity in his account increased during December, often times ending the day with in excess of twenty open contract positions. His December trades included various contract months of soybeans, soybean oil, pork bellies, and live hogs. Jenkins' account was often under margin in December, sometimes by as much as $16,150.00. By the end of December, Jenkins had liquidated all of his open positions. He had made $12,000.00 of cash deposits for the month and had a ledger[5] and equity[6] balance in his account of $299.00. His net account losses for December totalled $12,360.00 for a total net loss of $14,303.00 for the year.

Jenkins also traded heavily in January of 1978. Despite the fact that Jenkins made $51,000.00 of deposits in January, his account was still under margin on many days, including January 31 when Jenkins ended the month short 50 March pork bellies.[7] Even though Jenkins' account had a ledger balance of $50,393.00 on January 31, the account was still under margin by $60,925.00. Jenkins' net trading loss for January was $1,230.00. By January 31, 1978, Jenkins had made net cash deposits with REFCO since November 10 of $65,400.00. The table in Appendix A summarizes Jenkins' trading activity with REFCO from February 1 through March 8 and will help one to understand the subsequent discussion.

On February 10, Jenkins wrote checks payable to REFCO, drawn on his account, for a total sum of $250,000.00 and presented them to Nettum. Jenkins knew that he did not have sufficient funds in his account to cover the checks, so he requested, and obtained, a $250,000.00 loan from First Bank on February 14 to cover them. Jenkins used the same procedure to cover a $25,000.00 check made payable to REFCO on January 30, 1978. Jenkins testified that Nettum knew at the time various checks were presented to him for deposit in Jenkins' account that Jenkins did not have sufficient funds to cover them and that he needed to go to the bank to get more money. Nettum denied that he ever knew that sufficient funds were not in the account to cover checks drawn but stated that he knew Jenkins was going to the bank on March 6.

The basis of REFCO's action against Jenkins evolves around two $50,000.00 checks drawn on Jenkins' account and deposited by Nettum for REFCO on March 6. One of the two checks, signed and dated February 15, was given to Nettum prior to Jenkins leaving for Hawaii on February 20 or 21. That check was to be used to make a deposit in Jenkins' account, if necessary, while Jenkins was gone. Though the account was approximately $100,000.00 under margin during that time, Nettum declined to fill in and deposit the check. Nettum stated that he would not deposit the check until he had specific authorization from Jenkins to fill in the amount and was reluctant to deposit the check anyway because then he would not have any more checks remaining for security or to make additional deposits. The Chicago office was aware that Nettum was holding the check which

4. A pork belly contract consists of 36,000 pounds of frozen bacon. The pork belly market is considered to be quite volatile.

5. A ledger balance in an account includes all margin payments on deposit with adjustments for any profit or loss, less commission, incurred from closing out contract positions.

6. An equity balance includes a ledger balance adjusted for any profit or loss which would be

incurred if all open position were liquidated at that time.

7. A pork belly contract can either make or lose an individual up to $720.00 per day. With 50 short contracts, one runs the risk of losing $36,000.00 of equity if the market price goes up the limit, which is $2.00 per cwt. One also has the opportunity to gain $36,000.00 of equity if the market goes down the limit.

perhaps explains the reluctance of REFCO to close out the account. During the time Jenkins was in Hawaii, Nettum was in regular contact with him. At no time did Nettum request authorization to fill in the check and make a margin deposit.

On March 1, total equity in Jenkins' account was a negative $10,753.00. At the close of trading on March 1, Jenkins held 56 open positions, all short pork belly contracts. A limit up move the following day would mean an equity loss of $40,320.00. Likewise, a limit down move would mean an equity gain of $40,320.00 for the day. By the end of trading on March 2, the equity in Jenkins' account had declined to a negative $50,749.00. On March 3, Jenkins liquidated 42 of the 56 open contracts and at the close of trading had a negative equity in his account of $92,431.00. On Friday afternoon, Jenkins drafted and gave Nettum two $50,000.00 checks, the February 15 check and the one dated March 2. Nettum testified that he told Jenkins he needed the checks and probably would be liquidated if he did not receive them. However, on cross examination, Nettum said he probably did not tell Jenkins he would be liquidated if he did not come up with more money. It is important to note that at no time prior to the issuance of the two $50,-000.00 checks had Jenkins ever been forcibly liquidated out of the market by either REFCO or G.H. Miller. Jenkins testified that on no occasion prior to issuance of the two $50,000.00 checks was he ever told by Nettum that he would be liquidated if he did not meet the margin calls. Nevertheless, Nettum said that had Jenkins not given Nettum the two $50,000.00 checks, he would not have been allowed to stay in the market and that he would have been liquidated by REFCO.

Jenkins knew that at the time the checks were written, he did not have sufficient funds in his account to cover them. Even if, however, sufficient funds had been available, the $100,000.00 deposit would only have produced a positive equity of $7,569.00 in Jenkins' account as of the morning of March 6. Going into the morning of March 6, Jenkins had a short position on 14 pork belly contracts. Even if the two $50,000.00 checks had been honored, Jenkins would still have been under margin. Nevertheless, Nettum allowed Jenkins to take a short position on an additional 60 contracts on Monday morning, March 6, which increased Jenkins total open pork belly positions to 74. All these positions were short, thus a limit up would have decreased the equity in Jenkins' account $53,280.00 in one day. Andrew Curtis, REFCO's margin supervisor in the Chicago office, contacted Nettum on Tuesday, March 7, angry that Jenkins had put the positions on and that Nettum had allowed Jenkins to take more short positions in spite of the fact that two $50,000.00 checks had been deposited. Curtis' testimony was that even if the two $50,000.00 checks had been honored, "$100,000.00 did not even come close to providing the margin that we needed."

On Monday morning, March 6, Jenkins and Nettum had met for breakfast. Nettum testified that Jenkins said nothing about the possibility that the checks would not be covered. The Court is of the opinion that on Monday morning, Jenkins still felt the checks would be covered. Not until Monday afternoon, after the market closed, did Jenkins attempt to obtain a loan from First Bank to cover the two $50,000.00 checks. This is the manner in which he had covered checks on numerous occasions. This time First Bank refused to issue anymore credit to Jenkins. After First Bank turned down Jenkins' request for financing on Monday afternoon, Jenkins went to the American State Bank of Casselton, his hometown bank. At that time, Jenkins visited with the bank management about his sudden change in financial condition. What actually happened following the meeting with the Casselton State Bank is subject to dispute. Jenkins said that he then returned to Fargo and talked with First Bank on Monday night regarding his options. He understood that if he wished to stop payment on the checks, he would need to do so by 2:00 o'clock p.m. on Tuesday. Jenkins testified that he then called

Nettum on Monday evening, said he was going to stop payment, and that he wanted out of the market. Jenkins further testified that Nettum said not to do it because the market was going down. However, in his 1982 deposition, Jenkins said that he did not recall if he ever told Nettum to close the account or that he was going to stop payment. Nettum denies that Jenkins ever told him that he was going to stop payment on the checks. It is plausible that Nettum would have discouraged Jenkins from liquidating his account in hopes that the market would drop as Nettum also had short positions on pork belly contracts during this same time. Irregardless, Jenkins always had the authority at any time to liquidate his positions.

Nettum received instructions from Curtis in the Chicago office on Tuesday, March 7, that Jenkins' account would be liquidated by 11:00 a.m. unless $229,421.00 was wired by 11:00. This demand was made while REFCO was still under the impression that the two $50,000.00 checks would be honored. No money was wired, and the account was not liquidated. However, sometime that morning, five contracts were liquidated before the market was locked the "limit up" [8] between 11:00 and 12:00 noon. Curtis testified that at 11:00 a.m. Tuesday morning, Nettum told him that Jenkins' intent was to liquidate. By noon, the market was limit up, and Nettum testified he was talking with Jenkins about liquidating the account. However, Nettum said Jenkins still had complete control, and he was not about to take over his account. After the market was limit up, REFCO's Chicago office said that they needed money by 2:00 p.m. or the account would be liquidated. Nettum testified that the next morning Jenkins said to liquidate the account. Jenkins, however, maintains that he told Nettum on Monday evening and Tuesday morning to liquidate the account. Nevertheless, the account was liquidated on

Wednesday, March 8. Sometime on Wednesday afternoon, Nettum received word from First National Bank that Jenkins had stopped payment on the two checks.

On Tuesday, March 7, Jenkins listed some property for sale and also conveyed a quarter of land to Bruce Pearson, his broker with G.H. Miller, for approximately $10,000.00 plus satisfaction of an outstanding debt with Pearson. On March 8, Jenkins entered into a number of sales, conveyances, and refinancing arrangements with many of his creditors. The details of these transactions are considered by the Court to be immaterial to resolution of the issues before it as the reliance asserted by Nettum and REFCO was on the two $50,000.00 checks and not on specific assets which they did not even know were owned by Jenkins. By the time the conveyance on March 7 occurred, the market was already locked the limit up and there is nothing which REFCO nor Jenkins could have done to liquidate Jenkins' account.

### 3. MARGIN CALLS AND DEBIT EQUITY ACCOUNT.

Both parties spent considerable time trying to establish what is reasonable or unreasonable when traders are allowed to trade with outstanding margin calls or debit equity accounts.[9] The REFCO margin department in Chicago contacts all branches, including Nettum, on a daily basis and notifies them of the margin calls for each account. Mailed documentation of the accounts were also sent to the customers from the Chicago office, but they often times were not received by the customer until a number of days following the time the actual margin call occurred. Nettum would then call his customers, including Jenkins, when margin accounts were due and instruct them to that fact. The following language, regarding margin calls and

---

**8.** When the market is locked "limit up", buyers are willing to pay $2.00 per cwt. above the opening price that day for a pork belly contract, but no one is willing to sell at that price, so no trading occurs.

**9.** A debit equity account is an equity account with a negative balance.

debit accounts, was taken verbatim from REFCO's policy manual which was admitted into evidence:

## "MARGIN CALLS

The Account Executive then has the following responsibilities for each margin call:

1. He must contact the customer immediately and inform him of his margin call (it is not acceptable for the Account Executive to wait for the customer to receive his mailed margin call notice).
2. He must not allow the customer to trade further until the customer has met his margin call or until he is certain the customer is in the process of meeting his margin call.
3. He must liquidate or reduce the number of open positions in the customer's account sufficiently to reduce the margin requirement for any margin call which has not been met on the sixth trading day following the date of the written notice (the fifth day after the Account Executive was first notified of the margin call). Otherwise Refco will liquidate or reduce the positions on the seventh day.

It is the responsibility of the Account Executive to inform all of his customers of the following regulations and policies relative to margins:

1. Any margin call must be met no later than five trading days of the date of the written margin request.
2. Mail delays will not be accepted as a valid excuse for not meeting a margin call, nor will unsigned checks, checks sent to Chicago, vacations, business trips, etc.
3. Margin calls can only be met by sending in money or reducing positions. In other words, if market fluctuations subsequent to the margin call reduce the margin requirement back to the amount on deposit, the customer still must meet the margin call.

The Account Executive is responsible for deciding whether a customer is suffi-ciently reliable that the verbal promise that a check has been mailed is sufficient to allow the customer to increase his position.

It is illegal for an Account Executive to cover a customer's margin call under any circumstances.

The Account Executive should arrange to be able to contact the customer at any time in order to handle margin calls. When a customer is out of town, arrangements should be made for daily telephone contact; otherwise, the position should be liquidated, or a stop/loss order should be placed.

## DEBIT ACCOUNTS

The collection of customer debits is the responsibility of the Account Executive. It is the desire of the company to establish a procedure for the orderly and timely collection of customer debits by the Account Executive. Therefore, the following policy has been adopted,

Policy

There are three courses of action that can be taken when an account goes into debit.

1. The account may wire transfer sufficient funds to meet initial margin. Wire must come to Chicago and must arrive on the first day after going debit, or;
2. The account may give the Account Executive a check to cover initial margin. Check must be deposited in the local bank in sufficient time that verification may be made on the first day after going debit, or;
3. All positions can be liquidated. This action must be taken before the close on the first day after going debit.

One of these actions, or a combination of these actions MUST be taken. If the account has not come up to initial margin or liquidated the position by the end of the first day after going debit, the position will be liquidated on the opening (at

the market) on the second day after going debit."

Nettum testified that on virtually all occasions when he told Jenkins that he had a margin call due, Jenkins would respond by saying that he would either meet the margin call or liquidate the account. Nettum testified that part of the February 10 and 13 margin calls were nine days outstanding and that the REFCO policy was not being enforced. Nettum also testified that he would not ever have liquidated Jenkins' account because it was "Jenkins' account". Nettum did not know if he had the authority to liquidate, but he knew that Chicago did. On February 21, the account was still partially under margin from January. During the whole month of February, Jenkins never fully met his margin calls.

On February 23, Nettum began receiving pressure from Chicago to reduce Jenkins' position or liquidate. This pressure apparently continued through the first part of March, but the testimony is conflicting as to whether Jenkins was ever aware of the pressure being exerted by Curtis from the Chicago office.

Nettum testified that it is not uncommon for accounts to be under margin. Nettum further testified that the custom and practice is to wait as long as possible to make a margin call. However, REFCO was liberal in enforcing its margin requirements for Jenkins because he had a farm, a big house, a nice car, and because he had made large payments to his account in the past. Even though the $250,000.00 check had been verified by REFCO, the two $50,-000.00 checks were not verified because Jenkins had deposited large checks in the past and they were honored.

## CONCLUSIONS OF LAW

At trial, REFCO maintained that the Findings of Fact in the Bankruptcy Court's Order entered April 2, 1979, concerning Jenkins' actions on March 6 and 7, 1978, were binding on this Court on the basis of collateral estoppel. Preparatory to addressing the merits of the non-dischargeability action, the Court will discuss the collateral estoppel effect of the Bankruptcy Court's earlier Order. The Bankruptcy Court, in the context of determining whether Jenkins could involuntarily be adjudicated a bankrupt, found that Jenkins stopped payment on the checks without notice to Friedman or Nettum even though Jenkins was in the Friedman office on March 7, 1978, and that after the close of trading on March 7, Jenkins authorized Nettum to close out all his positions. In *Matter of Jenkins*, No. B-78-3095, slip op. at 4 (1978) (the U.S. District Court for the District of North Dakota reversed the Bankruptcy Court, dismissed the involuntary petition, and the Eighth Circuit affirmed, *Jenkins v. Petitioning Creditor-Ray E. Friedman*, 664 F.2d 184 (8th Cir. 1981)).

The doctrine of collateral estoppel precludes relitigation of an issue of fact when four criteria are met:

"(1) The issue sought to be precluded must be the same issue as that involved in the prior action;

(2) The issue must have been actually liquidated;

(3) The issue must have been determined by a valid and final judgment; and

(4) The determination of the issue must have been essential to the final judgment."

*In re Fercho*, 39 B.R. 764, 766 (Bankr.D.N.D.1984); *In re LaCasse*, 28 B.R. 214, 216 (Bankr.D.Minn.1983). The Bankruptcy Court's earlier Order was a determination as to whether Jenkins was exempt from being involuntarily adjudicated a bankrupt by reason of the "farmer exception" under the old Bankruptcy Act. His determination of the factual issues regarding communication between Jenkins and Nettum-REFCO on March 6 and 7, 1978, was wholly unnecessary and unessential to his determination that Jenkins did not fall within the farmer exception and could be involuntarily adjudicated a bankrupt. Thus, collateral estoppel does not prevent this Court from making

its own determination regarding the facts in the case at bar.

Section 523(a)(2)(A) of the Bankruptcy Code, which is the basis for REFCO's action, provides as follows:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

 Friedman, the party objecting to discharge, has the burden of proving its objections. Bankr.Rule 4005. This standard of proof in a section 523(a)(2) action is "clear and convincing evidence". *See In re Houtman,* 568 F.2d 651, 655 (9th Cir.1978); *In re Roberts,* 54 B.R. 765, 770 (Bankr.D. N.D.1985); *In re Mutschler,* 45 B.R. 482, 490 (Bankr.D.N.D.1984). Evidence in support of a section 523(a)(2) cause of action must be viewed consistent with the congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the "fresh start" policy of the Code. *In re Cross,* 666 F.2d 873, 879–80 (5th Cir.1982); *In re Hunter,* 36 B.R. 28, 31 (Bankr.D.N.D.1983), *rev'd on other grounds,* 771 F.2d 1126 (8th Cir. 1985).

The elements which REFCO must prove to have Jenkins' debt held non-dischargeable are as follows:

(1) that the debtor made false representations;

(2) that at the time made, the debtor knew them to be false;

(3) that the representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor reasonably relied on the representations; and

(5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*In re Roberts,* 54 B.R. at 770. *See also In re Houtman,* 568 F.2d at 651; *In re Mutschler,* 45 B.R. at 490; *In re Fercho,* 39 B.R. at 766; *In re Wightman,* 36 B.R. 246, 253 (Bankr.N.D.1984). To establish a prima facie case, each of the five above-mentioned elements must be proved by REFCO by clear and convincing evidence.

Friedman expressly and impliedly contends that two separate instances of misrepresentation occurred: the two $50,-000.00 checks issued by Jenkins to Nettum on March 3, 1978, drawn on an account that had insufficient funds; and that Jenkins did not instruct Nettum or REFCO of his decision to stop payment on the checks.

 Both parties have cited conflicting caselaw which addresses whether the issuance of a check carries an implied representation by the issuer that funds are available to honor the check when written. The United States Supreme Court, in *Williams v. United States,* 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982), determined that an insufficient funds check does not make any representations as to the state of an issuer's bank balance:

Although petitioner deposited several checks that were not supported by sufficient funds, the course of conduct did not involve the making of a "false statement," for a simple reason: technically speaking, a check is not a factual assertion at all, and therefore cannot be characterized as "true" or "false." Petitioner's bank checks—served only to direct the drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the banks dishonored the drafts. Each check did not, in terms, make any representation as to the state of the petitioner's bank balance.

*Williams,* 458 U.S. at 284–85, 102 S.Ct. at 3091–92. Although *Williams* was a criminal case, the elements necessary to establish the crime were very similar to the elements of a section 523 action in that the government had to establish that the de-

fendant (issuer) made a false statement for the purpose of influencing a financial institution upon any application, advance, commitment, or loan. *Id.* at 284, 102 S.Ct. at 3091.

REFCO relies heavily on *In re Kurdoghlian*, 30 B.R. 500 (Bankr.App. 9th Cir.1983), for the position that issued checks are "an implicit representation the checks were good". *Id.* at 502. It is important to note that the *Kurdoghlian* court made no reference to the *Williams* case. In *In re Younesi*, 34 B.R. 828 (Bankr.C.D.Ca.1983), another case relied upon by REFCO, *Kurdoghlian* was cited and reluctantly followed. In reference to the conflict between the *Kurdoghlian* decision and the Supreme Court's holding in *Williams,* the *Younesi* court stated:

> Although it is difficult to reconcile the language of the Appellate Panel's opinion with this Court's understanding of the prevailing law on this question, particularly in consideration of the above-quoted Supreme Court decision, the facts of the two cases are indistinguishable and I am bound to follow the Appellate Panel's direction.

*Id.* at 830–31.

REFCO also relies for support of its position on a pre-*Williams* case, *In re Anderson,* 10 B.R. 296 (Bankr.W.D.Wis.1981) and a post-*Williams* case, *In re Mullin,* 51 B.R. 377 (Bankr.S.D.Ind.1985), which cites *Anderson* and not *Williams.* The Bankruptcy Court for the Western District of Wisconsin, which decided *Anderson,* appears to have overruled *Anderson* in its recent decision, *In re Pokrandt,* 54 B.R. 691 (Bankr.W.D.Wis.1985), where the court held that "[t]he fact that a debtor knowingly issues an NSF check does not establish a misrepresentation". *Id.* at 692. *See also In re Sutton,* 39 B.R. 390, 397 (Bankr.M.D. Tenn.1984); *In re Hunt,* 30 B.R. 425, 438 (Bankr.M.D.Tenn.1983). This Court adopts the position and reasoning of the court in *In re Hammett,* 49 B.R. 533 (Bankr.M.D. Fla.1985), which rejected *Kurdoghlian* and deemed itself bound by the United States Supreme Court's decision in *Williams* and

will decline to infer misrepresentation from the mere fact of issuance of an NSF check. *Id.* at 534–35. Thus, REFCO cannot rely solely on the existence of an NSF check to establish misrepresentation; there must be additional proof in connection with the issuance of the check to establish a misrepresentation. *In re Hunt,* 30 B.R. at 438. The record is devoid of any proof that Jenkins made affirmative representations, at the time he issued the checks, that he had funds in his account from which to cover them. REFCO has not met its burden of establishing misrepresentation based on issuance of the checks.

■ Silence or concealment of a material fact can also constitute a false representation. *Matter of Weinstein,* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983); *In re Neumann,* 13 B.R. 128, 130 (Bankr.E.D.Wis. 1981); *Matter of Thomas,* 12 B.R. 765, 768 (Bankr.N.D.Ga.1981). Even though the NSF checks issued by Jenkins did not constitute a misrepresentation, a failure by Jenkins to notify Nettum of his inability to obtain credit to cover the checks, thus allowing Jenkins to remain in the market, could establish the misrepresentation element. What Jenkins did after he was unable to obtain credit on Monday is hotly disputed by the parties. Jenkins testified that he told Nettum, on Monday night and again on Tuesday morning, of his decision to stop payment on the checks and that he wanted to get out of the market. Jenkins further testified that Nettum told him to wait for a more opportune time to liquidate. Nettum testified that Jenkins never told him he was going to stop payment on the checks and that Jenkins did not instruct Nettum to liquidate until Wednesday morning. Although Jenkins' testimony is somewhat impeached by his deposition wherein he stated he did not know for sure if he told Nettum that he was going to stop payment on the check and that he wanted his account liquidated, Nettum's testimony is not harmonious with the testimony of Andrew Curtis, the head of the margin department for REFCO, who testified that at 11:00 a.m. Tuesday morning, Nettum

told him that Jenkins' intent was to liquidate. The Court is not of the opinion that either Jenkins' or Nettum's testimony is more trustworthy than the other and concludes that Friedman has not met its burden of establishing by *clear and convincing* evidence that Jenkins was silent or concealed the fact that he was going to stop payment on the checks. Although the lack of misrepresentation itself prevents the debt from being declared non-dischargeable, the Court will briefly discuss two other elements of a section 523(a)(2) action in the context of this case.

■ Had this Court determined that issuance of NSF checks is a misrepresentation, any assertion that the checks were issued with the intent and purpose of deceiving Friedman would be without merit. "If, at the time of making of the check, the defendant had a good faith and reasonable belief that he could make the check good before the drawee would present it for payment, then whatever deception is contemplated is of an insubstantial nature." *In re Hammett*, 49 B.R. at 535. Jenkins had, on previous occasions, presented Nettum with checks which were not at the time of issuance covered by funds in Jenkins' checking account. Upon issuance of many of his checks to REFCO, Jenkins' practice was to present the checks to Nettum and then, within the next day or two, go to First Bank of Fargo and obtain a loan to cover the issued checks. At least $275,000.00 of checks were covered in this fashion. Jenkins intended to cover the two $50,000.00 checks presented to Nettum on March 3, 1978, in the same manner. On Monday afternoon, March 6, he sought financing to cover the checks from First Bank, which was denied. Jenkins then traveled to his hometown bank in Casselton to discuss his financial condition and to see if he could obtain financing from them. Proof of Jenkins' inability to cover the drawn checks falls far short of proving an "intent and purpose" of deceiving. REFCO also alleges that financial transactions and conveyance and sales of assets, occurring on March 7 and March 8, indicated an intent to defraud and deceive REFCO.

However, the Court is not convinced that any intent, if it can be implied from these transactions, was present when the alleged misrepresentations were made. Any misrepresentation occurring or intent formed after the market was "limit up" is irrelevant because any damages sustained by REFCO thereafter were already destined to occur.

In addition to REFCO's failure to establish misrepresentation and an intent to deceive, it also failed to establish that it reasonably relied on any alleged misrepresentation of Jenkins. REFCO has not met its burden of demonstrating actual reliance which was "reasonable and justifiable under the circumstances." *In re Hunt*, 30 B.R. at 447. Any damages which REFCO asserts were incurred from relying on misrepresentations by the Debtor would logically have had to occur as a result of market movements on March 6 through March 8. The two $50,000.00 checks were not presented to Nettum until after the market had closed on Friday, March 3; thus, the status of the account could not change throughout the weekend. Therefore, the reliance element will be addressed only as to reliance which may have caused REFCO to incur damages on March 6–8.

REFCO's company policy regarding margin calls is that if an account is under margin for six days, REFCO will liquidate the account on the following day. The company policy regarding a debit equity account is that sufficient funds must be deposited in the account by the end of the first day after the account goes into debit, to bring the account out of debit and to cover the initial margin, or the account will be liquidated when the market opens on the morning of the second day after going into debit. Nettum testified that the purpose of the margin and debit policies is to protect REFCO and not the customers.

Jenkins' account was under margin at the close of every trading day from February 1 through March 7. The amount under margin varied from a low of $93,775.00 on February 1 to a high of $257,198.00 on

February 9. Jenkins' account was in debit on February 9 but came out of debit on February 10. On March 1, the account was $10,753.00 in debit, and on March 2, it was $50,749.00 in debit. No deposit was made on either occasion. REFCO ignored its own debit procedures and did not liquidate the account on the morning of March 3. On the afternoon of March 3, when the account was $92,431.00 in debit, Nettum received the two $50,000.00 checks from Jenkins. Even if the checks had been honored, Jenkins would have had a positive equity of only $7,569.00 in his account as of the morning of March 6. At that time, assuming the checks had been honored, Jenkins' account would still have been over $100,000.00 under margin. Without verifying the checks, and without demanding more money, Nettum allowed Jenkins to take a short position in 60 more pork belly contracts, for a total open short position in pork bellies of 74 contracts. Thus, a limit move would decrease the equity in Jenkins' account, in one day, by more than $50,000.00. It strikes the Court as wholly unreasonable for Nettum to have allowed Jenkins to obtain a position which would risk losing over $50,000.00 per day with essentially only $7,569.00 of margin money in his account, and without verifying the checks. A check delivered almost entirely in payment for an antecedent debt in a commodity account cannot be a basis for reasonable reliance in allowing continued trading. See In re Hunt, 30 B.R. at 447. Curtis' testimony via deposition is indicative of Nettum's unreasonable reliance on the check in allowing Jenkins to stay in the market and to take further positions in the market. He stated that the $100,000.00 (two $50,000.00 checks) did not even come close to providing the margin that REFCO needed for Jenkins' additional purchase and that he was angry that Jenkins put the position on and that Nettum allowed him to do so. The unreasonableness of Nettum in allowing the 60 additional positions to be taken is shown by Curtis' instruction to Nettum that the account would be liquidated unless $231,971.00 was wired by 11:00 a.m. on Tuesday morning, March 7. Curtis made

this demand, without having any idea that the checks would not be honored or that the stop payment would be issued. Nettum then told Curtis at 11:00 a.m. that the intent of either Jenkins or Nettum was to liquidate the account and, by 12:00 noon, the market was limit up.

The Court understands the delicate position of commodity brokers in regards to enforcing margin requirements. It is obvious that brokerage companies who are strict in enforcing their margin and debit account requirements will not be looked upon as favorably by customers, or potential customers, as are those who are not strict in enforcing their requirements. Nevertheless, this does not make the actions of the brokerage companies, such as REFCO, reasonable. If brokerage firms choose to be lax on their account requirements in order to obtain more customers, which means more commissions, then they must also bear the risks of loss incumbent upon them in not enforcing their account requirements. When one buys a big pig, they have to take the extra lard.

"Brokerage houses offer what is essentially a form of legalized gambling and credit. This credit is sometimes extended quite casually". In re Younesi, 34 B.R. at 829. REFCO and its employees, including Nettum, were lax in enforcing their margin requirements for Jenkins because he had a farm, a big house, a nice car, and because he had made large payments to his account in the past. Nettum did not know how many assets or liabilities Jenkins had but testified that he thought he was worth approximately a half a million dollars. Net deposits made by Jenkins into his REFCO account from November through March 3, including the two $50,000.00 checks, totalled $450,400.00. Even assuming that the two $50,000.00 checks had been honored, Nettum allowed Jenkins to continue his position in the market and to expand his position almost four-fold on the morning of March 6, inspite of the fact that Jenkins was still over $100,000.00 under margin without adding the new 60 contract positions and that he had deposited almost a

half a million dollars with REFCO throughout the course of their relationship. Nettum was unreasonable in assuming that because Jenkins had previously made large deposits, he had an unlimited amount of resources from which to draw. Nettum's own calculations, based upon *his* impression of how much Nettum was worth, should have revealed to him that Jenkins' well was almost dry. It was clearly unreasonable for Nettum and REFCO to allow Jenkins to take 60 more open positions in the market, and to continue his carryover positions, based upon the two $50,000.00 checks.

Because of the conclusions reached by the Court herein, it is unnecessary to address Jenkins' motion for a directed verdict.

Accordingly, and for the reasons discussed, Ray E. Friedman and Company's Complaint to determine Brent T. Jenkins' debt of $328,782.60, plus daily interest at the rate of $65.79 per diem from August 1, 1985, be declared non-dischargeable shall be and is hereby DISMISSED. Judgment may be entered in favor of the Defendant, Brent T. Jenkins.

IT IS SO ORDERED.

## APPENDIX A

| DATE | OUTSTANDING MARGIN CALL | DEPOSITS | CUMULATIVE DEPOSITS | LEDGER BALANCE | EQUITY BALANCE | PROFIT LOSS | CUMULATIVE PROFIT–LOSS |
|---|---|---|---|---|---|---|---|
| Brought forward | | | $ 65,400 | $ 50,393 | | | –$ 15,533 |
| FEB. | | | | | | | |
| 1 | $ 93,775 | | | | | | |
| 2 | $ 97,825 | | | | | | |
| 3 | $ 98,785 | | | | | | |
| 6 | $ 85,145 | $ 35,000 | $100,400 | $ 84,823 | | –$ 570 | –$ 16,103 |
| 7 | $143,660 | | | | | | |
| 8 | $189,020 | | | | | | |
| 9 | $257,198 | | | | –$155,198 | | |
| 10 | $113,538 | $250,000 | $350,400 | $233,203 | $ 36,580 | –$101,620 | –$117,723 |
| 13 | $113,538 | | | | | | |
| 14 | $113,538 | | | | | | |
| 15 | $113,538 | | | $234,547 | $ 80,314 | $ 1,344 | –$116,379 |
| 16 | $121,525 | | | $234,547 | $103,912 | | |
| 17 | $121,525 | | | $216,400 | $ 90,238 | –$ 18,147 | –$134,526 |
| 21 | $121,525 | | | $216,400 | $ 67,558 | | |
| 22 | $ 97,950 | | | $151,790 | $ 15,062 | –$ 64,610 | –$199,136 |
| 23 | $ 97,950 | | | $137,305 | $ 51,960 | –$ 14,485 | –$213,621 |
| 24 | $ 97,950 | | | $ 79,018 | $ 19,717 | –$ 58,287 | –$271,908 |
| 27 | $ 97,950 | | | $ 78,680 | $ 38,819 | –$ 338 | –$272,246 |
| 28 | $ 97,950 | | | $ 77,411 | $ 29,207 | –$ 1,269 | –$273,515 |
| MARCH | | | | | | | |
| 1 | $159,553 | | | $ 77,411 | –$ 10,753 | | |
| 2 | $209,549 | | | $ 77,411 | –$ 50,749 | | |
| 3 | $209,549 | $100,000* | $450,400* | –$ 46,153 | –$ 92,431 | –$121,464 | –$394,979 |
| 6 | $186,291 | | | $ 53,847* | –$ 17,091* | | |
| 7 | $229,421 | | | $ 39,422* | –$ 74,221* | –$ 14,175 | –$409,154 |
| 8 | $229,421 | | | –$224,208 | –$224,208 | –$163,000 | –$572,154 |

* These figures are based on the assumption that the $100,000.00 deposit on March 3 would be honored.