**In re Owen Gregory LARKIN, Debtor.**

**DRAKE CAPITAL SECURITIES, INC., Plaintiff,**

v.

**Owen Gregory LARKIN, Defendant.**

**Bankruptcy No. 93–16150–JNF.
Adv. No. 93–1860.**

United States Bankruptcy Court, D. Massachusetts.

June 12, 1995.

---

John Drew and Geoffrey Bok, Lane & Altman, Boston, MA, for Owen Gregory Larkin.

Stephanie Williams, Steven Manchel, Choate, Hall & Stewart, Boston, MA, for Drake Capital Securities, Inc.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### I. INTRODUCTION

The matter before the Court for determination is the Complaint filed by the Plaintiff, Drake Capital Securities, Inc. ("Drake"), against the debtor, Owen G. Larkin ("Larkin"). Through its complaint, Drake seeks a determination that a debt owed to it by Larkin in the sum of $130,272.00 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) or (a)(6). Larkin filed an answer denying the material allegations of the complaint. Thereafter, Drake filed a Motion for Summary Judgment. By Order and Memorandum dated September 23, 1994, this Court denied Drake's Motion for Summary Judgment. In accordance with the Pretrial Order, the parties filed a Joint Pretrial Memorandum which set forth certain stipulated facts. On April 20, 1995, a trial was held at which three witnesses testified and twelve exhibits were introduced into evidence. Based upon the stipulated facts, the testimony and documentary evidence, the Court now makes the following findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

### II. FACTS

On July 18, 1990, Larkin opened a margin account [1] with Drake (the "Drake account"),

---

1. Sally Case, a former Drake employee, testified that a margin account is one in which a client

a California broker/dealer of securities, affiliated with Correspondent Services Corporation ("CSC"), an entity that served as a clearing house for Drake's transactions and a custodian of its accounts. At the time he opened the margin account with Drake, Larkin testified that he understood its terms and procedures because he had maintained a similar account at Shearson Lehman Brothers ("Shearson"). In the summer of 1990, on the recommendation of a broker, Larry Kelley, Larkin directed Shearson to transfer his entire securities account, which consisted of stock in Hunter Environmental Services, Inc. ("Hunter Environmental") and Hunter Industrial Facilities, Inc. ("Hunter Facilities") to the Drake account.

Larkin testified that he regularly received monthly statements reflecting activity in the Drake account, which he understood. In September of 1990, Drake made a maintenance call on the account which Larkin satisfied with a check in the sum of $102,210.24. In March of 1991, Drake made another maintenance call on Larkin's account, and, on March 8, 1991, Drake sold 28,500 shares of Hunter Environmental, crediting his account with $111,362.13. The April statement for Larkin's Drake account, which Larkin admitted receiving, reflected that, as of March 28, 1991, Larkin had 86,100 shares of Hunter Environmental in his Drake account and a debit balance of $148,154.04. As of the end of March of 1991, the Hunter Facilities stock had minimal market value, whereas the Hunter Environmental stock was worth $3.125 per share.

On April 8, 1991, Drake made a maintenance call on Larkin's account and liquidated 28,357 shares of Hunter Environmental, crediting his account with $80,999.77. As of April 30, 1991, Larkin's Drake account had 57,743 shares of Hunter Environmental and a debit balance of $67,830.56.

In April of 1991, Larkin decided to transfer the Hunter Environmental stock in his Drake account to a custodial account in the name of his daughter (i.e., The Helen Isabelle Larkin Trust) at Prudential Bache in Florida (the "Prudential account") for which he had purchased 20,000 shares of Hunter Environmental. Larkin testified that he was upset with Drake because he had not received notice of the March 1991 compliance liquidations. In his view, the compliance liquidations decreased the value of his remaining shares in Hunter Environmental since the stock was not actively traded and volatile. However, Larkin also wanted the transfer effectuated to cover a margin call on the Prudential account.

Larkin initially sought to establish an account with Merrill Lynch with the assistance of Michael Malowney, a broker of that firm. However, Merrill Lynch rejected the account. According to Drake, the margin account was rejected by Merrill Lynch "due to history of failure to receive funds promptly." According to Larkin, the account was rejected because Merrill Lynch did not handle margin accounts containing stocks trading at under $4.00 per share. On April 17, 1991, with Malowney's assistance, Larkin sent a letter dated April 16, 1991, by facsimile, to Drake instructing Drake to "transfer from Paine Webber Account J T 1643496 for the account of Owen Larkin the following position *31,000* shares of Hunter Environmental Services, Inc. Transfer through DTC [Depositors Trust Corporation] to Prudential–Bache Securities. . . ." Despite these specific instructions, Drake did not immediately honor Larkin's April 16, 1991 transfer request because his account had a debit balance. Drake would not transfer the shares without transferring the debit for to do so would involve relinquishing the collateral for its loan.

On April 25, 1991, Shawmut Bank commenced a civil action against Larkin to collect monies owed on a line of credit. On the same date, the Suffolk Superior Court for the

has the ability to borrow money against the assets in the account, subject to the maintenance of certain equity percentages. She also testified that pursuant to applicable securities regulations if a client is unable to maintain the requisite equity in the account a broker dealer is required to notify the client by telephone or mailgram, a so-called maintenance or margin call. The client then has the option of either supplying the equity in the form of cash or other collateral within 72 hours or permitting the broker to liquidate sufficient securities to adjust the percentages—a so-called compliance liquidation.

Commonwealth of Massachusetts entered a restraining order prohibiting Larkin from "selling, assigning, pledging or otherwise transferring any stock [owned by Larkin] held by trustee defendant Hunter Environmental Services, Inc[.]" (the "Restraining Order"). By stipulation dated April 30, 1991, Shawmut and Larkin agreed that the Restraining Order would continue until May 14, 1991. On May 14, 1991, the Superior Court entered a preliminary injunction which prohibited Larkin from "giving over or otherwise transferring to Owen G. Larkin or any third party Owen G. Larkin's interest in any stocks or securities held by Hunter Environmental Services, Inc.; to surrender to an authorized court officer any stock or securities reflecting Owen G. Larkin's holdings[.]" (the "Preliminary Injunction").

By mailgram dated May 1, 1991, Drake notified Larkin that Merrill Lynch had rejected his account, demanded that Larkin pay his debit balance of $68,010 by May 3, 1991, and further indicated that the remaining shares would be sent to Larkin via registered mail. Larkin did not respond to the mailgram and, accordingly, between May 3, 1991 and May 7, 1991, as part of a compliance liquidation, Drake sold 20,238 Hunter Environmental shares to pay the debit balance, which left 37,505 shares of Hunter Environmental stock in Larkin's Drake account.

In May of 1991, another request for Drake to transfer the Hunter Environmental shares to the Prudential account was made. On May 10, 1991, another copy of the April 16, 1991 transfer request was faxed to Drake. Larkin testified that he did not contact Drake because of the Restraining Order against him. Larkin did not testify as to any instructions that he may have given to Merrill Lynch or Prudential Bache employees to stop efforts to effectuate the transfer of the Hunter Environmental shares to Prudential Bache in light of the Restraining Order and Preliminary Injunction. The absence of such testimony is notable in view of the admission that "[d]uring late April and early May of 1991, Larkin, as well as stockbrokers at Mer-

rill Lynch and Prudential Bache Securities, spoke with Drake on several occasions to inquire as to the whereabouts of this Hunter Environmental stock held by Drake." [2]

Sally Case ("Case"), Drake's manager in 1991, testified that because of the receipt of the second fax, enclosing the April 16, 1991 letter from Larkin she called Larkin on May 20, 1991 for clarification of his directions. She was unsure whether Larkin wanted all (37,505) or only 31,000 of the Hunter Environmental shares sent to the Prudential account. Case testified that in her telephone conversation with Larkin on May 20, 1995, he directed her to send the entire balance of 37,505 shares of Hunter Environmental in the Drake account to the Prudential account. Although Case specifically recalled Larkin confirming the transfer request for Hunter Environmental in this telephone conversation, she did not recall whether they had any discussion relative to Hunter Facilities at that time.

Larkin's recollection of the telephone conversation was completely different. He testified that he called Drake in late May for the purpose of effectuating a transfer of the Hunter Facilities stock. He stated that he asked Case to transfer shares in Hunter Facilities only and that he did not mention Hunter Environmental stock on the advice of one of his attorneys, John Drew, Esq. According to Larkin, Drew advised him not to talk to anyone about Hunter Environmental to avoid any allegation that he was violating the injunction. Larkin testified that he specifically did not ask Case to transfer Hunter Environmental shares for fear of violating the injunction. However, he did not advise Case of the injunction during this conversation.

On May 22, 1991, Drake honored Larkin's transfer request and directed the Depository Trust Company ("DTC") to transfer 37,505 shares of Hunter Environmental stock from the Drake account to Larkin's daughter's custodial account at Prudential Bache.

**2.** Drake submitted no evidence that employees of either Prudential or Merrill Lynch were acting as Larkin's agents. Had they done so, instructions delivered by them after the issuance of the Re-

straining Order and Preliminary Injunction on Larkin's behalf could have been attributed to Larkin under principles of agency law.

Drake was unable to accomplish this through customary DTC book entries because Larkin's shares in Hunter Environmental had been placed in certificate form in mid-May with Larkin identified as the owner. Drake physically did not send the actual certificate to the Prudential Bache account. As Larkin had directed the transfer proceed "through DTC", Drake borrowed shares, directed CSC to credit the Prudential account with the 37,505 shares, and debited Larkin's Drake account. Because CSC held the certificate, Drake believed it could re-register the certificate in CSC's name and credit Larkin's account in exchange for the shares sent to the Prudential account. On May 23, 1991, Paine Webber, acting as Drake's agent, sent a notice to the transfer agent stating that the Hunter Environmental certificate had been erroneously issued to Owen Larkin, and requesting that the certificate be cancelled and a new one issued to Drake's agent Kray & Co. The request was refused.

Larkin eventually sold the Hunter Environmental shares in the Prudential account, using the proceeds to pay his mortgage, living expenses, and tuition bills for his children over the next six to nine months. The Prudential account statement for the period ending June 30, 1991 reflected a value of $165,163.75 (consisting of 57,005 shares of Hunter Environmental worth $156,763.75 and 14,000 shares of Hunter Facilities worth $8,400), a debit balance of $42,073.84, and a total net worth of $123,089.91. The Prudential statement for the period ending July 31, 1991 reflected the same number of shares of Hunter Environmental and Hunter Facilities, but the securities' value had decreased to $142,386.88. The July statement also showed a debit balance of $42,417.44, and a total net worth of $99,969.44. The Prudential statement for the period ending August 31, 1991 reflected a total value for the securities of $93,961.25 (as 16,800 shares of Hunter Environmental were sold on August 2 and August 12), a debit balance of $2,610.16, and a total net worth of $91,351.09.

In June of 1991, Shawmut filed a complaint for contempt against Larkin in which it alleged that Larkin had violated the Restraining Order and Preliminary Injunction by virtue of the consummation on May 22, 1991 of the transfer of Larkin's Hunter Environmental securities from the Drake account to the Prudential account. The Superior Court conducted a trial, at which Larkin testified. Over Larkin's objection, the Court accepted Case's deposition testimony, a deposition which Larkin's attorney's did not attend.

After trial, the Superior Court issued a Memorandum in which it found that Larkin had willfully violated the injunction by not informing Case that he could no longer request the transfer of the stock to the Prudential account. By order dated March 19, 1992, the Superior Court ordered Larkin to surrender the Hunter stock certificate to Shawmut. However, in April of 1992, the parties settled the Shawmut action prior to the issuance of the court's Memorandum.

Larkin testified that during the settlement discussions with Shawmut's attorney about the Hunter Environmental certificate he advised Shawmut's attorney that it was worthless. Shawmut's attorney responded that in that event, Larkin should have no problem agreeing to the transfer, and Larkin agreed.[3] By letter dated April 27, 1992, Larkin requested the Transfer Agent that possessed the Hunter Environmental certificate to register any Hunter Environmental stock certificates held in his name to Shawmut. Drake had attempted to register the Hunter certificate in its affiliates' name, but the Transfer Agent refused because of the Preliminary Injunction. In May of 1992, pursuant to the March 19, 1992 order of the Superior Court, the Transfer Agent transferred the Hunter certificate to Shawmut, leaving Larkin's Drake account with a deficit in the sum of $132,272.00. Larkin testified that he was unaware that the Hunter Environmental securities were erroneously deposited into the Prudential account and also certificated until January of 1992.

3. Drake's counsel neither objected to the question eliciting this testimony nor moved to strike it.

## III. ARGUMENTS

Drake seeks to except the $130,272.00 debt from the debtor's discharge on two alternative grounds: 1) that the debt is for money obtained by false pretenses, false representations, and actual fraud; and 2) that the debt arose from a willful and malicious injury. According to Drake, Larkin's failure to advise it of the Restraining Order and Preliminary Injunction constituted a misrepresentation, made with intent to deceive, upon which it relied to cause the transfer of the Hunter Environmental shares to the Prudential account, resulting in its loss of $130,272.00. Drake argues both that Larkin had an affirmative duty to advise it of the injunction and his lack of authority to transfer the stock, and that Larkin should have advised it that the transfer order should be halted. Accordingly, Drake asserts that these facts establish fraud and that the debt resulting from that fraud must be excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

Alternatively, Drake asserts that Larkin's direction to Case on May 20, 1991 to transfer the Hunter Environmental stock to the Prudential account was done with knowledge that he was prohibited from doing so, which direction constituted a willful and malicious injury, making the debt nondischargeable under 11 U.S.C. § 523(a)(6). Drake emphasizes that it has proven that Larkin took affirmative steps to effectuate a transfer of the Hunter Environmental stock after the injunction had issued, and points out that in the Superior Court action, Larkin's attorneys admitted that he took actions to complete the transfer.

Larkin contends, as a factual matter, that he did not request Drake to transfer the Hunter Environmental stock after the issuance of the Restraining Order and that he did not violate the Restraining Order or Preliminary Injunction. He states that the only post-injunction request he made of Drake was to transfer the Hunter Facilities stock. Larkin also argues that he was not under any legal obligation to inform Drake of the Restraining Order. Finally, Larkin claims that he did not understand the mechanics of stock transactions, and that he did not know that the Hunter Environmental stock was erroneously deposited into the Prudential account in violation of the injunction.

## IV. DISCUSSION

A debt shall be excepted from discharge under Bankruptcy Code section 523(a)(2)(A) when the debt is "... for money obtained by ... false pretenses, a false representation or actual fraud." 11 U.S.C. § 523(a)(2)(A). A debt is nondischargeable under this subsection when it is the result of the debtor's false statement, made with knowledge of its falsity, made with the intent to deceive the creditor, and where the creditor reasonably relies upon the representation to its detriment. *In re Burgess,* 955 F.2d 134, 140 (1st Cir.1992); *In re Sestito,* 136 B.R. 602, 605 (Bankr.D.Mass.1992). The plaintiff must prove each and every element of an exception to discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). A debtor's silence and failure to disclose a material fact may constitute a misrepresentation actionable under section 523(a)(2)(A). *In re Van Horne,* 823 F.2d 1285, 1288 (8th Cir.1987) (borrower has duty to divulge all material facts touching upon the essence of the transaction). The Court of Appeals for the Eleventh Circuit has adopted a more restrictive view, ruling that an actual overt false representation is necessary to except a debt from discharge for fraud. *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986).

The Court is persuaded that the view of the United States Court of Appeals for the Eighth Circuit is correct because the exception to discharge under section 523(a)(2)(A) is a codification of the common law tort of deceit. Silence may constitute a misrepresentation for the purposes of an action of deceit where there is a failure to disclose information that one is bound to reveal. *See Van Horne* 823 F.2d at 1288; *see also In re Jenkins,* 61 B.R. 30, 40 (Bankr.D.N.D.1986); *In re Maier,* 38 B.R. 231, 233 (Bankr.D.Minn. 1984); *Matter of Weinstein,* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983).

In considering the testimony of Larkin and Case, the Court finds that Case was the more credible witness. Although debtor's

counsel attempted to impugn her testimony by raising bitterness as a motive for it, Case testified that her role in the loss suffered by Drake did not affect her career. Moreover, having received conflicting instructions about the transfer of the Hunter Environmental shares, her testimony that she sought and obtained clarification from Larkin of his wishes with respect to the Hunter Environmental stock is consistent with the facts Larkin admitted, and logical under all the circumstances.

With respect to Larkin's testimony, the Court notes that Larkin had acquired 20,000 shares of Hunter Environmental stock for the Prudential account and was attempting to satisfy a maintenance call with respect to that account through the transfer of stock in the Drake account. His testimony that he only spoke to Case about the Hunter Facilities stock when Case was asking about the Hunter Environmental stock is not credible. As Larkin's intentions with respect to the Hunter Environmental stock precipitated Case's telephone call, Larkin could only have avoided discussion of the Hunter Environmental stock by disclosing the existence of the Preliminary Injunction. Furthermore, Drake transferred the Hunter Environmental stock to the Prudential account within two days of the telephone conversation.

Thus, this Court finds that on May 20, Larkin knew that he no longer had that the legal authority to accept the Hunter Environmental shares. His silence, when he had a duty to disclose the injunction, qualifies as a misrepresentation made with knowledge of its falsity under section 523(a)(2)(A). Moreover, the Court finds that Drake proved that Larkin's silence was with intent to deceive Drake. An intent to deceive is proven when a debtor makes a misrepresentation "... which any reasonable person would know would induce another to act." *In re Pommerer,* 10 B.R. 935, 940 (D.Minn.1981). Regardless of whether Larkin affirmatively directed Drake to transfer the stock after the entry of the injunctions, he allowed Drake to proceed under the misconception that he continued to have the authority to transfer the Hunter Environmental stock when he had actual knowledge of the injunction and that his authority had terminated.

Finally, Drake demonstrated that it reasonably relied on Larkin's misrepresentations to its detriment. In other words, it established that Larkin's silence was the act without which it would not have suffered a loss. *Van Horne,* 823 F.2d at 1288. Case testified that Drake would not have transferred the Hunter Environmental stock to the Prudential account had she been apprised of the injunction. As a result of Larkin's conduct, Drake borrowed Hunter Environmental shares to transfer to the Prudential account under the mistaken assumption that the certificate it held in Larkin's name could be re-registered. These actions resulted in its loss of $130,272.00. For these reasons, the Court finds that Drake sustained its burden of proving all the elements of an exception to discharge under section 523(a)(2)(A).

In light of the above rulings, it is unnecessary for the Court to determine whether the debt should be excepted from discharge under section 523(a)(6).

## V. CONCLUSION

For the foregoing reasons, the Court grants judgment in favor of the Plaintiff and against the Defendant on Count I of its Complaint in this adversary proceeding, and grants judgment in favor of the Defendant and against the Plaintiff on Count II of the Complaint.