In re David L. PRINTY, Debtor.

**DEAN WITTER REYNOLDS INC., Plaintiff,**

v.

David L. PRINTY, Defendant.

Bankruptcy No. 94–12270–JNF.
Adv. No. 94–1531.

United States Bankruptcy Court,
D. Massachusetts.

Oct. 13, 1995.

Joseph S.U. Bodoff and Evan Slavitt, Hinckley, Allen & Snyder, Boston, MA, for Debtor/Defendant David L. Printy.

Mary K. DeNivi, Bingham, Dana & Gould, Boston, MA, for Plaintiff Dean Witter Reynolds Inc.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

### 1. INTRODUCTION

The matters before the Court are the Motion for Summary Judgment and the Motion for Judgment on the Pleadings, filed by

Dean Witter Reynolds Inc. ("Dean Witter") with respect to its Complaint and the Debtor's Counterclaim, respectively.[1] The Debtor opposed both motions. The Court heard the motions on April 25, 1995, following which the Court directed the parties to depose two Dean Witter employees and the Debtor and file supplemental briefs.

## II. FACTS

Based upon the affidavits, depositions and admissions on file, the Court now makes the following findings of fact. The Debtor, David L. Printy, and his two sons, Charles B. Printy, II and David Luther Printy, were the co-trustees of the Andrea L. Printy Family Trust (the "Trust"), which was established in October of 1986. On August 26, 1992, the Debtor arranged for the transfer of the administration of the Trust from First Trust to the Minneapolis, Minnesota office of Dean Witter, a broker-dealer of securities registered with the Securities and Exchange Commission and a member of the National Association of Securities Dealers ("NASD"). The Debtor opened the account in the name of the Trust and funded it with a wire transfer of $50,000.00 from First Trust to Dean Witter.

Michael Krmpotich ("Krmpotich") was the account executive at Dean Witter charged with oversight of the Trust account. Krmpotich was not a stranger to the Debtor. The Debtor had attempted to recruit Krmpotich as an employee for State Bond Sales Corporation, a broker-dealer located in New Ulm, Minnesota with which he was affiliated at one time. Additionally, according to the affidavit of Thomas B. Heffelfinger on file in this case, "Mr. Krmpotich had previously demonstrated to Mr. Printy that he was willing to extend credit to Mr. Printy on closely held securities. [H]e had extended a $300,000 loan to Mr. Printy and his wife based on a closely held security." When Krmpotich solicited the Debtor's business and presented Dean Witter's financial services to him, the Debtor accepted the offer on behalf of the Trust. Moreover, at the time the Debtor arranged for the transfer of the Trust assets from First Trust to Dean Witter, he was a sophisticated and knowledgeable investor, having obtained a broker's license himself and having held senior management positions in a number of financial services companies and entrepreneurial enterprises spanning almost two decades.

The Debtor and his co-trustees executed an Active Assets Account agreement with Dean Witter, which was notarized on September 30, 1992. Pursuant to the agreement, the Debtor, on behalf of the Trust, agreed to the arbitration of controversies arising in connection with the account.[2] Additionally, the Debtor, on behalf of the Trust, granted Dean Witter a security interest in

---

**1.** Pursuant to Fed.R.Civ.P. 12(c), which is made applicable to this proceeding by Fed.R.Bankr.P. 7012, this Court may treat the Motion for Judgment on the Pleadings as a motion for summary judgment because materials were presented to the Court outside the scope of the pleadings.

**2.** The agreement contained the following provisions:

> **Arbitration Disclosures.** In connection with the arbitration agreement which follows, I understand that
> (a) Arbitration is final and binding on the parties.
> (b) The parties are waiving their right to seek remedies in court, including the right to jury trial.
> (c) Pre-arbitration discovery is generally more limited and different from court proceedings.
> (d) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek

> modification of rulings by the arbitrators is strictly limited.
> (e) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry.
> **Arbitration of Controversies.** I agree and, by carrying accounts, you agree that all controversies between me or my agents and you or your agents, representatives or employees arising out of or concerning any such accounts, any transactions between us or for such accounts, or the construction, performance or breach of this or any other agreement between us, whether entered into prior to, on or subsequent to the date below, shall be determined by arbitration only before the National Association of Securities Dealers, Inc.; the New York Stock Exchange, Inc.; the Municipal Securities Rulemaking Board; or the National Futures Association as I may elect.... The award of the arbitrator or a majority of the arbitrators shall be final. Judgment on the award rendered may be entered in any state or federal court having jurisdiction.

any securities or property held by the Trust to secure repayment of any obligations owed by the Trust to Dean Witter.[3] In conjunction with the Active Assets Account, the Trust took advantage of three financial services: a checking account, a margin account and an investment account.

On or around September 8, 1992, First Trust transferred and Dean Witter received the following assets: a U.S. Treasury Note and stock holdings in Baxter International Inc., Marion Merrill Dow Inc., Vital Heart Systems Inc., Eastman Kodak Co., Wyerhaeuser Co., Bankamerica Corp., and J.P. Morgan & Co. Additionally, First Trust transferred interests in two non-publicly traded entities: 150,000 shares of Health Concepts, Inc. ("Health Concepts") and an interest in MCI Medical Seed Limited Partnership. The Debtor was the president, secretary and an individual shareholder of Health Concepts, a closely held research and development firm, engaged in the production of conducive adhesives. As president of Health Concepts, the Debtor knew that the stock in the company "[did] not freely trade on any exchange or the OTC [over-the-counter] market."

Dean Witter prepared and mailed to the Debtor at his home in Rockport, Massachusetts monthly statements both summarizing and detailing assets, income and activities for cash and money market funds, stocks/options, municipal .bonds, corporate fixed income investments, government securities, and other investment vehicles. The Debtor admitted receiving the monthly statements. The following charts summarize information sent to the Debtor with respect to the Trust account. In the charts, the categories in column one are as follows: A = TOTAL ASSET VALUE/VALUE OF STOCKS/OPTIONS; B = INCOME; C = DEPOSITS; D = ASSETS SOLD; E = TOTAL OF CHECKS WRITTEN; F = TOTAL WITHDRAWALS; G = ASSETS BOUGHT; H = ASSETS RECEIVED (credited to the account); I = ASSETS DELIVERED (debited from the account); and J = DEBIT BALANCE/AUTHORIZED LIMIT (of borrowing).

| DATE | 8/92 | 9/92 | 10/92 | 11/92 |
|---|---|---|---|---|
| A | 40,505.00/ –0– | 191,533.31/ 141,104.50 | 3,845,293.24/ 3,775,925.00 | 110,024.49/ 100,475.00 |
| B | –0– | 133.72 | 633.05 | 1,633.76 |
| C | 50,000.00 | –0– | 3,800.00 | –0– |
| D | –0– | 93,267.08 | 18,997.00 | –0– |
| E | –0– | –0– | –0– | 25,462.13 |
| F | 9,400.00 | 27,100.00 | 18,000.00 | 38,902.01 |
| G | –0– | 104,988.24 | 7,000.00 | –0– |
| H | –0– | 183,669.00 | 3,637,500.00 | –0– |
| I | –0– | –0– | 24,990.00 | 3,712,500.00 |
| J | 5,415.00/ 40,505.00 | 15.00/ 1,772.00 | –0–/ 33,632.00 | 58,765.26/ 11,547.00 |

| DATE | 12/92 | 1/93 | 2/93 | 3/93 |
|---|---|---|---|---|
| A | 4,066,908.68/ 4,984,275.00 | 3,177,048.12/ 4,478,587.50 | – 583,173.81/ 826,923.00 | – 600,230.82 /7,875.00 |

3. The agreement contained the following provisions:

**Security Interest and Liquidation.** If at any time I should owe you any money for transactions in my margin account or any other account I maintain with you, or for any loan you make to me, you will be entitled to a security interest in any securities or other property you hold for me to assure the repayment of my debt to you. I hereby authorize you, should you for any reason whatsoever in your sole discretion deem it necessary for your protection or advisable: (a) to redeem shares I own in my Active Assets Trust; (b) to require additional collateral or equity from me; (c) to sell any or all of my securities and other property, from any of my accounts, and apply the proceeds against debits in that account or any other accounts....

Notwithstanding your general policy of giving notice of a margin deficiency, I understand you may and hereby authorize you to liquidate securities and other property to satisfy margin maintenance requirements without notice to me and without any prior request for additional margin from me.

| DATE | 12/92 | 1/93 | 2/93 | 3/93 |
|---|---|---|---|---|
| B | 137.44 | 3,176.71 | 813.97 | 1,144.74 |
| C | –0– | –0– | –0– | 5.22 |
| D | –0– | 104,654.56 | –0– | 978,252.14 |
| E | 85,501.11 | 232,170.14 | 5,721.44 | –0– |
| F | 177,000.00 | 141,500.00 | –0– | –0– |
| G | 662,022.60 | 213,288.49 | 100,128.97 | –0– |
| H | 3,487,500.00 | 8,500.00 | –0– | 978,252.14 |
| I | –0– | –0– | – 2,962,500 | –0– |
| J | 985,666.63/ 528,164.00 | 1,470,715.48/ 1,135,250.00 | 1,582,949.92 /–0– | 608,105.82/ –0– |

The total asset value of the Trust for the month ending September 30, 1992 was approximately $190,000.00. The statement for that period did not reflect receipt of either the Health Concepts stock or the interest in MCI Medical Seed. However, the statement for the month ending October 1992 reflected receipt of 150,000 shares of "Coastal Health Care GP Del" ("Coastal Health Care") on October 28, 1992 with a value of $3,637,-500.00. The value of Coastal Health Care stock represented over 96% of the total value of all stock in the Trust account, and stocks and options represented over 98% of the total value of all assets in the account. In his deposition, the Debtor testified that he never authorized the purchase of 150,000 shares of Coastal Health Care and never received confirmation slips with respect to any such purchase.

The reason for the misinformation appearing on the Trust's monthly statements was, as Dean Witter admits, a transcriptional error made in its Midwest Operations Center. At the center, the wrong stock identification code for Health Concepts derived from a so-called CUSIP number was entered into the computer. This error caused the Trust statements to show a position in Coastal Health Care, a company whose stock was publicly traded.

On November 16, 1992, the Debtor sent a fax to Krmpotich and his assistant, Lynn Jorgenson, stating the following: "... please deliver *from* the trust account 15,000 shares of Coastal Health Care—leave them in the name of the trust and mail them to my Rockport address." Ms. Jorgenson informed the Debtor that Dean Witter was unable to arrange for the delivery of anything but the entire position. The Debtor authorized the delivery of all the shares, and, eventually, he received a certificate for 150,000 shares of *Health Concepts*, not Coastal Health Care, as he had requested.

The statement for the month ending November 30, 1992, though perpetuating the mix-up between Health Concepts and Coastal Health Care, reflected this transaction. The statement showed that, as of November 25, 1992, the value of 150,000 shares of Coastal Health Care stock, valued at $3,712,500.00, had been debited from the account. The total asset value showed a corresponding diminution in value: the value of stocks/options decreased from $3,775,925.00 as of October 31, 1992 to $100,475.00 as of November 30, 1992.

On December 1, 1992, the Debtor returned the Health Concepts certificate to Dean Witter for deposit in the Trust account. Dean Witter repeated the initial encoding error. It sent the Debtor a statement for the month ending December 31, 1992 that showed the receipt on December 2, 1992 of 150,000 shares of Coastal Health Care, valued at $3,487,500.00 and a corresponding dramatic increase in the value of stocks/options from $100,475.00 to $4,984,275.00 resulting from the Coastal Health Care stock being credited to the account and the purchase of a number of other securities. Thus, in December, Coastal Health Care accounted for 77% of the total value of the Trust's stocks and options.

The Debtor stated at his deposition that he had questions about how his account *as a whole* was being valued. Nevertheless, he admitted that *at no time* did he report to Krmpotich or Ms. Jorgenson that he owned

stock in Health Concepts, not Coastal Health Care, that the statements erroneously listed stock in Coastal Health Care, not Health Concepts, and that he would not have expected the stock in Health Concepts to be worth between three and four million dollars.

The authorized limit for borrowing against the assets in the margin account was computed based upon the account's money market trust and cash balances, as well as an available loan amount based upon a percentage of the assets in the margin account, which assets were identified on the statement with an asterisk, minus the debit balance. For example, on the August and September statements, the authorized borrowing limit was tied to sums in the money market account and cash. In October, the authorized limit was keyed to a U.S. Treasury Note valued at $36,968.75. In November, the authorized limit was tied to several stocks in the margin account (Humana, Inc., J.P. Morgan & Co., Medisys, Inc., Rochester Gas & Electric, Sierra Pacific Resources, and Wyerhaeuser Co.) and adjusted by a debit balance of $58,765.26. That same month, the Debtor did not purchase any stock for the Trust account, and the account's activity was limited to the delivery of the Coastal Health Care stock, the receipt of dividends and withdrawals by wire transfer and checks, totalling $64,364.14.

The statement for the month ending December 31, 1992 reflected the return of Coastal Health Care shares to the account. Moreover, it showed that the Debtor purchased between 800 and 2,500 shares of stock in 14 different companies and withdrew through wire transfers or checks $262,501.11 from the account. The account had a debit balance of $985,666.63 that month. In January of 1993, with an authorized limit of $1,135,250.00, the Debtor purchased 500 to 10,354 shares of stock in seven different companies and withdrew by check or wire transfer $373,670.14 from the account. In both December and January, the Coastal Health Care stock was utilized in calculating the authorized limit for margin borrowing and denominated with an asterisk on the monthly statements.

As reflected on the February 1993 statement, Dean Witter rectified the stock identification error with respect to Health Concepts and Coastal Health Care and made a margin call. The statement showed 150,000 shares of Coastal Health Care with a value of $2,962,500 debited from the account ("delivered") on February 22, 1993 and 150,000 share of Health Concepts with a value of $-0- credited to the account ("received") on the same day. Notably, on Schedule B—Personal Property, the Debtor also ascribed a zero value to his interest in Health Concepts, and he did not even discuss the stock in the liquidation analysis section of his Disclosure Statement submitted in conjunction with his Plan of Reorganization.

On March 30, 1993, Dean Witter filed a Statement of Claim to commence an arbitration proceeding against the Debtor, his sons and the Trust before NASD. Dean Witter's Statement of Claim contained eight counts, six of which were directed against the Debtor alone. The eight counts included counts for theft (Minn.Stat. § 332.51), receiving stolen property (Minn.Stat. § 609.53), common law fraud, violations of state securities laws (Minn.Stat. § 80A.01), common law conversion and common law replevin. Dean Witter sought $603,548.00 in damages, together with interest and attorneys' fees, against all the respondents and punitive damages against the Debtor.

The Debtor responded to Dean Witter's statement of claim, raising several "affirmative allegations." These allegations included the following:

1) Printy met with Krmpotich and "thoroughly reviewed all of the assets that were in the Family Trust and which would be transferred to Dean Witter;"

2) "Krmpotich was informed orally and by the list of assets that the trust contained stock in a company known as Health Concepts, Inc.;"

3) Neither Printy nor his sons ever represented or implied that the Trust held stock in Coastal Health Care;

4) Printy questioned the October statement from Dean Witter, which showed assets valued in excess of $3 million dollars, and spoke with Krmpotich who gave him an evasive and noncommittal response;

5) Printy instructed Dean Witter to send him the Coastal Health Care stock in "an effort to demonstrate to Dean Witter its error in listing the Coastal Healthcare [sic] stock as one of the assets;"

6) Upon receipt of the certificate, Printy determined that the CUSIP number AFB42 placed by Dean Witter on the face of the Health Concepts stock certificate was a transaction number assigned by Dean Witter categorizing the stock to which the number was assigned as an ownership in a non-traded stock, rather than publicly traded stock such as Coastal Health Care;

7) Printy was satisfied by his examination of the certificate that he "had assisted Dean Witter in clarifying the Family Trust's asset holdings;"

8) In the past, "Krmpotich had assisted Printy in obtaining an advance of large sums of money collateralized by non-tradeable securities;"

9) Krmpotich recommended that Printy utilize the margin borrowing features of the Trust account to purchase various securities;

10) Printy informed both Krmpotich and Ms. Jorgenson "that he would not direct the Trust to buy anything on margin until the questions about the valuation of the Family Trust's assets were answered;"

11) Ms. Jorgenson "called Printy and advised him that the Dean Witter margin clerk had confirmed the value of the assets in the Family Trust and that based upon that, there was plenty of buying power;"

12) Dean Witter established the value of assets held in the Family Trust for purposes of margin account activities;

13) The borrowing of funds from Dean Witter was pursuant to the contract between Dean Witter and the Family Trust;

14) "On information and belief, the Family Trust's account at Dean Witter was used to conduct unauthorized transactions in Coastal HealthCare [sic] stock;" and

15) The Respondents have no personal liability to Dean Witter.

These allegations were supported by an affidavit filed by the Debtor in conjunction with the arbitration proceeding.

On January 20, 1994, the panel of arbitrators issued an award which found the Debtor, his co-trustees and the Trust liable for compensatory damages of $634,820.00 plus interest from February 1, 1993 through the date of payment of the award. The panel also found the Debtor liable for punitive damages, pursuant to Minn.Stat. § 549.20, in the amount of $375,000.00. Prior to Dean Witter obtaining confirmation of the award, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Dean Witter obtained relief from the automatic stay, however, and on January 30, 1995, the Hennepin County District Court for the Fourth Judicial District confirmed the award.

The arbitrators did not issue findings of fact or conclusions of law. Other than the reference to Minn.Stat. § 549.20 in the award, the Court has limited information as to what evidence was presented to the arbitrators. However, consistent with the Debtor's "Affirmative Allegations," Thomas B. Heffelfinger indicated in his affidavit that Krmpotich "testified during the arbitration that he failed to comply with Dean Witter's 'know your customer' requirement and he simply believed Mr. Printy to be a 'multimillionaire.'"

Dean Witter filed the instant adversary proceeding against the Debtor on August 22, 1994. The Debtor answered the Complaint and filed a Counterclaim against Dean Witter. The Counterclaim contained three counts: breach of contract, negligence, and breach of the duty of good faith and fair dealing. With respect to Count I of the Counterclaim, Printy alleged that Dean Witter breached its contract with the Trust, which contract he guaranteed, by failing to accurately report the stock holdings of the Trust, by failing "to correct the statements of the account when its errors were called to its attention," by failing to comply with applicable rules and regulations, and by failing to supervise its personnel. In Count III of the Counterclaim, the Debtor alleged that Dean Witter was acting in bad faith by seeking the imposition of punitive damages against him

when it had alleged in other arbitration proceedings that punitive damages are not available under New York law or any other law.

## III. POSITIONS OF THE PARTIES

### A. *Dean Witter*

Dean Witter argues that its arbitration award and the order confirming it collaterally estop the Debtor from contesting summary judgment on its claim for willful and malicious injury under 11 U.S.C. § 523(a)(6). Alternatively, it maintains that the undisputed facts support summary judgment on the same claim. Dean Witter also argues that the doctrine of *res judicata* applies to preclude determination of all issues raised in the Counterclaim and compels summary judgment in its favor with respect to the three counts of the Debtor's Counterclaim.

Dean Witter maintains that the findings necessary for punitive damages under Minn. Stat. § 549.20,[4] are "virtually identical" to the essential elements of willful and malicious injury under section 523(a)(6), because a "willful" injury is a deliberate or intentional one, and a malicious injury is one incurred as a result of an act done in conscious disregard of another's rights or the actor's duties. In Dean Witter's view, any issues raised by the Debtor with respect to his intentions contravene common sense and should not serve to put it to the expense of a trial. *See Matter of Friedenberg*, 12 B.R. 901, 906 (Bankr. S.D.N.Y.1981).

Following the Debtor's deposition, which took place on July 12, 1995, Dean Witter filed a so-called "Deposition Commentary" in which it noted that almost all of the Debtor's margin borrowing on behalf of the Trust took place after the Debtor knew beyond a doubt that the account did not own 150,000 shares of Coastal Health Care and that, regardless

of whether Krmpotich actively encouraged the Debtor to purchase securities, the Debtor voluntarily participated in and ultimately made all decisions with respect to the management of the Trust account. Dean Witter also emphasized in its Commentary that the Debtor's claim that he thought the account had sufficient value to support the margin borrowing is rebutted by his own testimony as to his 18 years of experience in the financial services industry and his admissions 1) that he did not believe that the stock in Health Concepts was worth the value stated in the monthly statements for Coastal Health Care; and 2) that when he questioned Krmpotich and Ms. Jorgenson about the value ascribed to his account, he never mentioned the discrepancy between his ownership of Health Concepts and the listing of Coastal Health Care in the monthly statements and Dean Witter's use of Coastal Health Care stock (denominated by an asterisk) to calculate the extent of margin borrowing. In short, according to Dean Witter, the Debtor admitted that he did not rely on the statements or the encouragement of Krmpotich or Ms. Jorgenson to trade in the account.

Dean Witter also maintains that when the counts set forth in the Debtor's Counterclaim are compared with the Affirmative Allegations set forth in his response to the Dean Witter's Statement of Claim in the arbitration proceeding, the conclusion is inescapable that the same transactions or series of transactions are placed in issue by the two pleadings. In its words, "the two pleadings spring from the same core of operative facts." According to Dean Witter, it would not have received the award that it did if the arbitrators believed that it breached its contract with the Trust or negligently handled the account, thereby damaging the Debtor.

---

4. Section 549.20 provides in relevant part the following:

Subdivision 1. (a) Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others.

(b) A defendant has acted with deliberate disregard for the rights or safety of others if the defendant has knowledge of facts or intentionally disregards facts that create a high proba-

bility of injury to the rights or safety of others and;

(1) deliberately proceeds to act in conscious or intentional disregard of the high degree of probability of injury to the rights or safety of others; or

(2) deliberately proceeds to act with indifference to the high probability of injury to the rights or safety of others....

Minn.Stat. § 549.20.

Likewise, Dean Witter maintains that since it sought punitive damages in the arbitration proceeding, the Debtor is precluded from now asserting that punitive damages cause a breach of an implied covenant of good faith and fair dealing.

### B. *The Debtor*

In his opposition to Dean Witter's Motion for Summary Judgment, the Debtor argues that his knowledge of "the true value and ownership" of the Trust is a material issue of fact in dispute. Moreover, the Debtor, citing *Chestnut Hill Dev. Corp. v. Otis Elevator Co.*, 739 F.Supp. 692, 697 (D.Mass.1990), argues that a confirmed arbitration award is only entitled to *res judicata* effect for matters actually decided by the arbitrator or necessary to his or her decision. According to the Debtor, because he did not raise counterclaims in the arbitration proceeding, his Counterclaim is not barred. Additionally, the Debtor maintains that there is no final judgment confirming the arbitration award and that even if the doctrine of *res judicata* could be applied it should not be on equitable grounds. In support of this contention, the Debtor points to Dean Witter's initiation of criminal charges against him during the pendency of the arbitration proceeding, requiring him to assert his Fifth Amendment privilege against self-incrimination and, thereby, limiting his ability to present a defense. Finally, the Debtor maintains that collateral estoppel should not apply as the punitive damage award did not mean necessarily that the arbitrators found that the Debtor's conduct was willful and malicious for purposes of section 523(a)(6). In the Debtor's view, an injury caused by reckless disregard of a person's rights may be dischargeable. The Debtor stated the following:

> The plain language of the Minnesota statute indicates that this statute does not require findings equivalent to the "willful and malicious" requirements under § 523(a)(6). The difference between the Minnesota statute and § 523(a)(6) is one of degree. Section 523(a)(6) requires a finding that a debtor's actions 'have a purpose of producing injury or have a substantial certainty of producing injury.' [*In re]* *Conte*, 33 F.3d [303,] 307 [ (3d Cir.1994) ].

In contrast, the Minnesota statute requires only a finding that the debtor's actions create a 'high probability of injury.' Minn. Stat.Ann. § 549.20, subd. 1(b)(1), (b)(2). '[H]igh probability' is less than substantial certainty.' *Conte*, 33 F.3d at 307.

The Debtor, in his second supplemental opposition to Dean Witter's Motion for Summary Judgment, also maintains that summary judgment is inappropriate in this case with respect to Dean Witter's claim under section 523(a)(6) because "[t]he deposition testimony establishes genuine issues of material fact regarding Dean Witter's intervening conduct." Specifically, the Debtor argues that certain acts and omissions of Dean Witter in opening, monitoring, and operating the Trust account were significant intervening factors in its loss. The Debtor points to the following: 1) Krmpotich's failure to elicit and record critical financial information about the Trust, meaning that it was ill-equipped to follow the "know thy customer" rule; 2) Dean Witter's failure to review the Trust account to determine the appropriateness of margin use and its consistency with investment objectives; 3) Dean Witter's failure to investigate the withdrawal of stock from the Trust account and its subsequent redeposit; 4) the transfer of the Coastal Health Care stock from the cash to the margin side of the Trust account; and 5) Krmpotich's active encouragement of the Debtor to borrow against an inaccurate account balance.

## IV. DISCUSSION

### A. *Standards for Summary Judgment*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) made applicable to this proceeding by Fed.R.Bankr.P. 7056. The standards for allowing summary judgment and directed verdicts are similar, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986), and summary judgment requires that

all *reasonable* inferences be drawn in favor of the party opposing the grant of summary judgment. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 431 (1st Cir.1992) (citations omitted). According to the United States Court of Appeals for the First Circuit, "[t]his means ... that summary judgment is inappropriate if inferences are necessary for the judgment and those inferences are not mandated by the record." *Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 763 (1st Cir.1994) (citing, *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 488 (1st Cir.1992) (warning that summary judgment is precluded "unless no reasonable trier of fact could draw any other inference from the 'totality of the circumstances' revealed by the undisputed evidence")). Thus, summary judgment is appropriate only if " 'there can be but one *reasonable* conclusion as to the verdict.' " *Id.*, quoting, *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. at 2511 (emphasis added). "If *rea-*

*sonable* minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir.1992) (emphasis added).

### B. *Section 523(a)(6)*

Section 523(a)(6) excepts from discharge debts "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). Following the enactment of the 1978 Bankruptcy Code and the House Judiciary Committee's report accompanying the bill, which stated that " 'willful' means deliberate or intentional" and clarified that recklessness was no longer the standard for willfulness, *see* H.R.Rep. No. 595, 95th Cong., 2d Sess., at 365, reprinted in 1978 U.S.Code Cong. & Adm.News, 5787, 5963, 6320–21, nine of the eleven circuits have addressed the meaning of the terms "willful" and "malicious."[5] De-

---

**5.** *See* Third Circuit: *In re Conte*, 33 F.3d 303, 304 (3d Cir.1994) ("An injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with substantial certainty that injury would result."); Fourth Circuit: *St. Paul Fire & Marine Ins. Co. v. Vaughn*, 779 F.2d 1003, 1008 (4th Cir.1985) (in eschewing specific malice or some other strict standard of malice in case in which contractor deposited money in his own account rather than the account of his surety in contravention of a settlement agreement, the court stated "if the act ... is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge]."); *Hagan v. McNallen (In re McNallen)*, 62 F.3d 619 (4th Cir.1995) (same); Fifth Circuit: *Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 486 (5th Cir.1986) (in case involving debt incurred as a result of gambling with creditor's money that was to be held in trust, the court stated " '[w]illful' means intentional and 'malicious' means without just cause or excuse."); Sixth Circuit: *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226 (6th Cir.1991) (no intent to cause injury required); *Perkins v. Scharffe*, 817 F.2d 392 (6th Cir.), *cert. denied*, 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112 (1987) (in medical malpractice situation, the court, following *In re Franklin, infra*, ruled that willful means a deliberate or intentional act that necessarily produces harm; malicious means without just cause or excuse); *Wheeler v. Laudani*, 783 F.2d 610 (6th Cir.1986) (in a case where the issue was whether a libel was willful, the court determined that malice means without just cause or excuse); Seventh Circuit: *Goldberg Securities, Inc. v. Scarlata*, 979 F.2d 521 (7th Cir.1992) (the court affirmed

lower court rulings that found that willful and malicious injury is one that automatically or necessarily causes injury); Eighth Circuit: *In re Hartley*, 869 F.2d 394, 395 (8th Cir.1989) (in case where debtor threw a lighted firecracker into room filled with gasoline fumes to "scare" a former employee, the court ruled that a specific intent to injure must be shown—a certain or almost certain to cause harm standard); *Cassidy v. Minihan*, 794 F.2d 340 (8th Cir.1986) (in drunk driving case, court ruled intentional infliction of injury required); *Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875 (8th Cir.1985) (conversion of lender's funds found to be a willful and malicious injury); Ninth Circuit: *Transamerica Commercial Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551 (9th Cir.1991) (in a case involving alleged conversion of funds by corporate principals, the court stated that malice may be inferred from the nature of the wrongful act and that it is not necessary to show that the debtor intended to injure the creditor; a wrongful act, without just cause or excuse, that necessarily produces harm is sufficient); *In re Cecchini*, 780 F.2d 1440 (9th Cir.1986) (in a case involving the wrongful conversion of funds, the court determined that the phrase "necessarily produces harm" means that the act must be targeted at the creditor, at least in the sense that the act is certain or almost certain to cause harm); Tenth Circuit: *Dorr, Bentley & Pecha, CPA's, P.C. v. Pasek (In re Pasek)*, 983 F.2d 1524 (10th Cir.1993); *In re Compos*, 768 F.2d 1155 (10th Cir.1985) (intentional injury required); *First Nat'l. Bank of Albuquerque v. Franklin (In re Franklin)*, 726 F.2d 606 (10th Cir.1984) (in medical malpractice case,

spite the overwhelming number of circuit court decisions, there is no consensus as to whether the statute requires an intentional act that results in injury or an act committed with the intention of causing injury. *See In re Conte*, 33 F.3d at 306, citing *Perkins v. Scharffe*, 817 F.2d 392, 393 (6th Cir.1987). Indeed, among those courts that require an intentional act that results in injury there is disagreement as to whether the wrongful act must almost certainly produce harm or whether a high probability of causing harm suffices. *See Conte*, 33 F.3d at 306, comparing *Cecchini*, 780 F.2d at 1443 (acts that will almost certainly produce harm), with *Perkins*, 817 F.2d at 394, and *Franklin*, 726 F.2d at 610 (intentional acts that have a high probability of producing harm). As the court noted in *In re Zalowski*, 107 B.R. 431, 434 (Bankr.D.Mass.1989), "[t]he distinctions ... among intentional, reckless, negligent and non-tortious conduct lie in the degree of risk or harm, which runs from substantial certainty to a reasonable risk." The circuit courts evaluate debtors' conduct along this continuum depending upon the nuances attributed to the terms intentional and malicious.

In its own words, the United States Court of Appeals for the First Circuit has not "passed on this difficult and controversial issue." *See Piccicuto v. Dwyer*, 39 F.3d 37, 41 (1st Cir.1994). Nevertheless, in that case the court permitted the interpretation of "willful and malicious injury" agreed upon by the parties to the dispute to stand: "for an act to be willful and malicious under § 523(a)(6), it must be 'deliberate,' 'wrongful' and 'done without regard to its consequences.'" *Id.* This interpretation is entirely consistent with the dictionary definitions of the terms "willful" and "malicious," and, furthermore, is consistent with the interpretations utilized by judges in this district.

In the most recent decision from this district, *In re Lubanski*, 186 B.R. 160 (Bankr. D.Mass.1995), Judge Boroff distinguished cases in which courts have held that a determination that conduct is "willful and malicious" requires proof of a specific intent to harm a creditor or a creditor's property, *see Pasek*, 983 F.2d at 1527; *Hartley*, 869 F.2d at 395, and those cases in which courts have held that a determination that conduct is willful and malicious requires only a showing that a debtor intentionally committed an act, without just cause or excuse, which necessarily produced injury, *see Howard*, 946 F.2d at 1228–29; *Littleton*, 942 F.2d at 555. He noted that several decisions in this district have adopted the standard of implied or constructive malice, *Madden v. Fate (In re Fate)*, 100 B.R. 141 (Bankr.D.Mass.1989); *Materia v. Pereira (In re Pereira)*, 44 B.R. 248 (Bankr.D.Mass.1984); *In re Trudeau*, 35 B.R. 185, 187 (Bankr.D.Mass.1983), and have held that "'malicious' means an act done in conscious disregard of one's duties ... [and] ... [n]o special malice toward the creditor need be shown." *Lubanski*, 186 B.R. at 165. Judge Boroff adopted the implied or constructive malice standard, stating "the term 'willful and malicious' in § 523(a)(6) means an act intentionally committed, without just cause or excuse, in conscious disregard of one's duty and that necessarily produces an injury." *Id.* at 165. *See also In re Zalowski*, 107 B.R. at 434 ("'An injury to an entity or property may be a malicious injury ... if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will. The word 'willful' means 'deliberate or intentional,' a deliberate and intentional act which necessarily leads to injury.'"). This Court is persuaded by his reasoning that "'requiring proof that a debtor subjectively intended to harm a creditor's interests would impose a nearly insurmountable burden on a creditor seeking to have a debt declared nondischargeable under § 523(a)(6).'" *Lubanski*, 186 B.R. at 165 (quoting *Littlefield v. McGuffey (In re McGuffey)*, 145 B.R. 582, 586 (Bankr.N.D.Ill. 1992).

Without discussing the cases dealing with section 523(a)(6) from this district or the First Circuit, the Debtor urges the Court to follow the standard set forth by the United

---

court ruled that disregard of acceptable medical standards was willful and malicious); Eleventh Circuit: *Hope v. Walker (In re Walker)*, 48 F.3d 1161 (11th Cir.1995) (injury must be intended or substantially certain to result from intended act; malice refers to conduct that is wrongful and without just cause or excuse and does not require personal hatred, spite or ill-will).

States Court of Appeals for the Third Circuit in *Conte*. In that legal malpractice case, the court held that "[a]n injury is willful and malicious under the Code only if the actor purposefully inflicted the injury or acted with *substantial certainty* that injury would result." 33 F.3d at 304 (emphasis supplied). Accordingly, the court determined that collateral estoppel could not be applied because the jury had found that the debtor only had acted with a "high degree of probability that his clients would be harmed and reckless indifference to the consequences". 33 F.3d at 307. The court reasoned that when Congress required more than recklessness, "it required the debtor have engaged in conduct more culpable than taking a deliberate action that had a high probability of producing harm." *Id.* at 307. The Third Circuit Court of Appeals added that "for an injury to be willful it surely must be more than a highly likely but unintended result of the debtor's action. Rather, for the injury to have been 'willed' by the debtor, it must at least have been substantially certain to result from the debtor's act." *Id.* at 307.

## C. *Analysis*

■ The Debtor relies upon the language in *Conte* to argue that collateral estoppel should not be utilized to prohibit him from litigating the issue of whether his conduct was "willful and "malicious" under section 523(a)(6) because the arbitrators' award of punitive damages could have been based upon less culpable conduct—conduct that may have had a high probability of producing injury but was not substantially certain to result in injury. Because the collateral estoppel effect of arbitration awards in the context of section 523(a) proceedings is disputed, *see Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223, 105 S.Ct. 1238, 1243–44, 84 L.Ed.2d 158 (1985); *P & S X-Ray Co., Inc. v. Dawes (In re Dawes)*, No. 94 B 17143, 1995 WL 461880 at 4–5 (Bankr. N.D.Ill.1995); *Norrell Health Care, Inc. v.*

*Clayton (In re Clayton)*, 168 B.R. 700 (Bankr.N.D.Cal.1994), because the Debtor is correct in noting that the Minnesota statute merely requires an intentional act that has a high probability, rather than a substantial certainty, of producing injury, and because the evidentiary materials in this case are sufficient for this Court to determine the Debtor's liability under section 523(a)(6), the use of collateral estoppel is unwarranted.

■ Regardless of whether this Court adopts the approach taken in *Conte* or the slightly less stringent standard articulated by the court in *Lubanski*, the Court finds that the material facts that are undisputed compel the conclusion that summary judgment is appropriate with respect to Dean Witter's claim under section 523(a)(6). The Court has sufficient evidence from which to find that the Debtor willfully and maliciously injured Dean Witter by withholding from it information that he had a duty to disclose and by both borrowing and withdrawing funds from the margin account based upon a loan availability derived from Coastal Health Care stock, which he knew the Trust did not own.

■ In *In re Varrasso*, the court stated that issues involving a party's state of mind could be resolved, under the appropriate circumstances, at the summary judgment stage "if the nonmoving party rests merely upon conclusory allegations, improbable inferences and unsupported speculations." 37 F.3d at 764, *quoting, Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). The court in *Varrasso* added that "circumstantial evidence may be sufficiently potent to establish fraudulent intent beyond hope of contradiction." 37 F.3d at 764. In this case, the Debtor's conduct speaks volumes,[6] and the circumstantial evidence compels the entry of summary judgment on Dean Witter's section 523(a)(6) count. The Debtor has rested upon "conclusory" allegations about Dean Witter's conduct in opening and supervising the Trust account and "improbable"

---

6. The Debtor's silence when he had a duty to speak constitutes a false representation of material fact for purposes of section 523(a)(2)(A). *See In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir. 1987); *Peterson v. Bozzano (In re Bozzano)*, 173

B.R. 990, 993 (Bankr.M.D.N.C.1994); *Durbin v. Miranda (In re Miranda)*, 172 B.R. 55, 60 (Bankr. E.D.Mo.1994); *Drake Capital Securities, Inc. v. Larkin (In re Larkin)*, 189 B.R. 234 (Bankr. D.Mass.1995).

and unarticulated inferences about his own conduct to suggest that Dean Witter has failed to establish that his debt to it is non-dischargeable under section 523(a)(6).

This Court finds that the Debtor knew a mistake had been made when he examined the October statement listing Coastal Health Care and showing assets in excess of $3,500,-000.00. His instructions to Dean Witter to send the Coastal Health Care certificate to his Rockport address evidence that knowledge. Upon receiving the certificate for Health Concepts, the Debtor's awareness of an error was corroborated. As he said in his affidavit submitted in conjunction with the arbitration proceeding, which affidavit also highlights the Debtor's sophistication in financial matters, "[t]he number 'AFB42' appearing on its [the certificate's] face is a CUSIP number which I ascertained was a number assigned by Dean Witter and which indicated that the stock to which the number assigned was an ownership interest in a non-publicly traded company (such as Health Concepts, Inc.) rather than in a publicly traded company such as Coastal HealthCare, Inc. [sic] )."

The Debtor then returned the Health Concept certificate to Dean Witter with a note stating, "[t]his should stay in the Family Trust acct." The Debtor did not inform Dean Witter that there was a mixup between Health Concepts and Coastal Health Care when he returned· the certificate, and he did not inform Dean Witter of his discovery when the December statement again reflected 150,000 shares of Coastal Health Care in the Trust account. Although the Debtor stated in his affidavit that he was satisfied that he had clarified that the account held no Coastal Health Care stock, the Debtor's clarification was limited because he did not share his knowledge with Dean Witter, and he proceeded to utilize the margin feature of the account to trade and withdraw funds from the account based upon the value ascribed to the Coastal Health Care stock.

■ The substantial weight of the evidence—the February 1993 monthly statement ascribing a $-0- value to the stock, as well as the Debtor's own zero valuation of the stock in his schedules filed with this Court in

April of 1994—compels the conclusion that the Health Concepts stock had no value. The Debtor in his affidavit admitted that he had no reason to believe that the 150,000 shares of Health Concepts were worth $4 million and that he did not have any idea of what the true value of the Trust account was in December of 1992. Under these circumstances, the Court finds that the Debtor was obligated to point to some evidence to support an inference that the Trust account had sufficient value to support the level of trading and withdrawals he made. In other words, if the Debtor believed that Health Concept stock had a value other than zero before February of 1993, to withstand Dean Witter's motion for summary judgment, he was obligated to submit some evidence of what he believed that value to be. For purposes of Dean Witter's motion, the Court finds that the Debtor's statements in his deposition and in his pleadings that he did not know that value or the value of the Trust account assets is insufficient as a matter of law to create an issue of material fact as to whether his conduct was with or "without just cause or excuse." As president of Health Concepts in late 1992 and early 1993, the Debtor was in a unique position to know the value of the stock of Health Concepts. His disinclination to ascribe a value to that stock in December of 1992 when the bulk of the account activity took place warrants a finding that the value of the stock was zero then, just as it was zero in February 1993 and at the time the Debtor filed his schedules. As the Supreme Court stated, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Court finds that there is no evidence that would create a reasonable inference that the Debtor's conduct was not willful and malicious.

■ An inference that could have been drawn, namely that the Debtor's conduct was merely reckless, is not a reasonable one under the totality of the circumstances. To repeat, the Debtor failed to submit by way of affidavit or otherwise, any evidence to over-

come the evidence that the Health Concepts stock was worth nothing. *Cf. Briden v. Foley,* 776 F.2d 379 (1st Cir.1985) (if circumstances remain unchanged, retrojection of financial condition is permitted for finding of insolvency). Accordingly, the Debtor's conduct with respect to the account when he knew that the account did not own the Coastal Health Care stock, which overwhelmingly contributed to the account's value and its borrowing availability, necessarily produced harm. Moreover, because the Debtor acknowledged that Health Concepts stock was not worth the value ascribed to Coastal Health Care stock, his utilization of the value of that stock to withdraw funds totalling more than five times the original investment in the Trust for his personal and family use was substantially certain to result in injury to Dean Witter when the mistake was discovered.

Because the margin account involved the grant of security to Dean Witter in the account's assets to cover trading losses, the Debtor was in effect representing, by his silence when he had a duty to speak, that the Coastal Health Care stock belonged to the Trust and was available as collateral to both justify and satisfy his trading and any losses that might result from that trading or from the withdrawals that were made from the account that exceeded the value of the assets in the account. In one of the most typical scenarios under section 523(a)(6), a debtor's conduct is determined to be willful and malicious when he or she sells collateral subject to a security agreement without remitting the proceeds to the secured party. *See People's Savings Bank of Brockton v. Cardillo (In re Cardillo),* 39 B.R. 548 (Bankr.D.Mass. 1984). Here, the Debtor misled Dean Witter as to the very existence of the collateral as security in the first instance. Although the Debtor did not sell the collateral and fail to remit proceeds, he withdrew large sums of money and traded in the margin account based upon the stock identification error. In effect, he was using, indeed converting, Dean Witter's assets, not assets of the Trust, to finance his trades and personal and family expenditures. When Dean Witter rectified its mistake as to the identity of the collateral, predictably there were insufficient funds to cover the losses. Although the mechanism of injury in the two situations is different, the financial losses suffered as a result of the treatment of collateral are indistinguishable. In these types of situations, as Judge Coffey noted in his dissenting opinion in *Scarlata,* 979 F.2d at 529, the bankruptcy discharge should not serve to encourage "a stockbroker or other fly-by-night financial manipulator who finds himself over his head to gamble with another person's money...."

■ The Debtor would have this case turn on causation for purposes of both section 523(a)(6) and 523(a)(2)(A). In his view, Dean Witter's injury was the result of its negligence or its breach of contract with respect to opening the account, preparing accurate monthly statements or monitoring the account. This Court unequivocally rejects these notions because the Debtor was under a continuing obligation to report directly and without prevarication to Dean Witter that his account was erroneously showing a position in a publicly traded stock that it did not own. Regardless of what encouragement he may have received from Krmpotich or Ms. Jorgenson to trade in the account based on assurances of its value from the margin department, the Debtor knew, at all material times, that he did not own the stock that was creating the highest percentage of value in the account, and his silence was "the act, without which the claimant would not have suffered the loss complained of." *See Van Horne,* 823 F.2d at 1288–89 (interpreting proximate cause element of 523(a)(2)(A)).

■ This Court is obligated to draw all *reasonable* inferences in favor of the Debtor. The inferences that the Debtor implicitly would have this Court draw both with respect to his reliance on assurances by Krmpotich or Ms. Jorgenson that trading in the Trust account was proper or with respect to his communications with them about the value of the account are unreasonable in light of all the evidence. If the Debtor had submitted even a modicum of evidence that Health Concepts had significant value or that he was a naive investor without the capacity to read and understand his monthly state-

ments or that Dean Witter employees engaged in conduct that could be categorized as controlling or overreaching, the result might be different. However, the Debtor submitted no evidence to contradict the valuations of the Health Concepts stock that both he and Dean Witter used, and he admitted in his deposition that he was a sophisticated investor and at all times ultimately responsible for the management of the account. He stated: "it ... [was] ... a collaborative effort that we [the Debtor and Krmpotich] discussed various investments and *ultimately I would agree or disagree.*" (emphasis supplied). Accordingly, because Dean Witter has established that the Debtor's conduct was willful and malicious, the Court finds that the Debtor is obligated to Dean Witter in the liquidated sum of $1,009,820.00, as found by the arbitration panel, which sum includes punitive damages that together with the compensatory damages are not dischargeable under the circumstances of this case.

### D. *The Counterclaims*

■ The Court finds, after an examination of the Counterclaim and the Affirmative Allegations raised in the arbitration proceeding that the doctrine of *res judicata* prevents litigation of the claims. The Debtor's counterclaims arise out of the same transaction and occurrence as Dean Witter's claims against the Debtor and properly should have been (and most likely were) considered by the arbitrators. More importantly, even in the absence of *res judicata,* based upon the existing record, the Court is unable to discern how the Debtor was damaged by any of the actions taken by Dean Witter. Since at all material times the Debtor knew that the Trust did not own stock in Coastal Health Care, and that the Health Concepts stock was not worth $3–4 million, it is impossible for this Court to envision a scenario pursuant to which the Debtor, after withdrawing in excess of $700,000.00 from the account for personal and family uses, could recover for breach of contract, negligence, or breach of the covenant of good faith and fair dealing. The Debtor breached his agreement with Dean Witter and, contrary to the Debtor's view, this Court finds that the Debtor caused all trading in the account and did

not have rely upon Dean Witter's employees or statements to justify his actions.

The Court has examined the Debtor's schedules which do not list any contingent, unliquidated claims against Dean Witter. The Debtor's failure to list his present counterclaims against Dean Witter shall be dispositive as to their existence and value.

### IV. CONCLUSION

In accordance with the foregoing, the Court hereby enters summary judgment in favor of Dean Witter on its section 523(a)(6) count, thereby mooting the remaining counts of its complaint, and the Court also grants Dean Witter's Motion for Judgment on the Pleadings with respect to the Debtor's Counterclaim. Dean Witter shall have a nondischargeable claim against the Debtor in the amount of the arbitration award as confirmed by the Minnesota District Court. A separate order shall enter.